IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CENTRAL BUCKS SCHOOL DISTRICT | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 22-1128 |
| | : | |
| Q. M., M. M., T. M. | : | |

## MEMORANDUM

KEARNEY, J.                                                    September 12, 2022

We today address a school district's obligations under federal law to provide a free appropriate public education funded by taxpayers for a high school student living with Prader-Willi syndrome, a rare genetic spectrum disorder creating an insatiable desire for food along with affecting cognitive, physical, emotional, and behavioral functions. The student attended the district's elementary and middle school until May 2021 of his ninth-grade year when his parents enrolled him in private year-round residential school with a $280,000 annual tuition. The student's parents filed a due process complaint seeking tuition reimbursement for the residential school for the 2021-2022 school year (his tenth-grade year) and compensatory education for the school district's failure to provide a free appropriate public education for 2019-2020 and 2020-2021 school years.

The administrative hearing officer examined an extensive record and conducted a four-day due process hearing with ten witnesses. The hearing officer found the district provided its student with a free appropriate public education for the 2019-2020 and 2020-2021 school years. The hearing officer reached a different conclusion for the 2021-2022 school year after finding the district's education plan did not provide the maturing but regressing student with a free appropriate public education for his tenth-grade year (the 2021-2022 school year) but the private residential

school did offer the appropriate education given the student's food security issues. The hearing officer directed the district to reimburse 85% of the student's tuition at the private residential school but did not address the three months of the year-round school year between May and August 2021.

The district sued the student and his parents seeking to vacate the 2021-2022 reimbursement award. The parents responded by suing the district for compensatory education for the 2019-2020 and 2020-2021 school years, additional tuition reimbursement for the 2021-2022 school year, and attorneys' fees and costs. The parents also challenge the district's proposed individualized education program for this upcoming school year (2022-2023) and seek reimbursement for this year's tuition. The parties now seek judgment on the administrative record for the immediate past three school years and summary judgment on the parents' claim for reimbursement for the 2022-2023 school year tuition not raised before the hearing officer.

We grant in part and deny in part both parties' motions challenging the hearing officer's reasoned decision: the hearing officer did not err in finding the District provided student a free appropriate public education for the 2019-2020 and 2020-2021 school years; the hearing officer also did not err in finding the District failed to provide student a free appropriate public education for the 2021-2022 school year and affirm the hearing officer's award of 85% of the tuition reimbursement with the addition of $68,956.32 for 85% of the May 2021 through August 2021 tuition not properly addressed in the administrative process; and, the Parents are not entitled to compensatory damages under Section 504 of the Rehabilitation Act or the Americans with Disabilities Act, but we grant them leave to file for attorneys' fees under the Individuals with Disabilities Education Improvement Act and expert costs under Section 504 of the Rehabilitation Act and the Americans with Disabilities Act.

We also deny both parties' motions for summary judgment as to the upcoming eleventh-grade school year (2022-2023) because we find genuine disputes of material fact as to whether the district provided the student with a free appropriate public education for this upcoming year. We need to evaluate the evidence during our upcoming non-jury trial or, if the parties timely elect, to remand to the hearing officer's expertise for findings as to the current school year.

## I.    Background.[1]

Q.M. is a seventeen-year-old student born with Prader-Willi syndrome, a rare genetic condition which impacts his entire life.[2] Physicians also diagnosed Q.M. with neurogenic scoliosis, hypotonia (low muscle tone), leg length discrepancy, narcolepsy with cataplexy, attention deficit disorder, morbid obesity, sleep apnea, verbal apraxia, asthma, learning disabilities, outbursts of explosive behaviors, and a mood disorder.[3]

Q.M. began attending school in the Central Bucks School District in kindergarten and received special education services through elementary school.[4] Q.M. has been eligible for and always provided with special education services while attending the District school.[5]

### *Life with Prader-Willi syndrome.*

Our analysis of Q.M.'s and the District's claims require, unlike many cases involving school districts and young persons with learning challenges, to try our best to understand the significant complications in an education plan for a student living with Prader-Willi syndrome. Prader-Willi syndrome is a complex and rare genetic disorder affecting approximately one in 10,000 to 30,000 people worldwide.[6] A genetic change on chromosome number fifteen causes Prader-Willi syndrome.[7] The syndrome affects many parts of the body.[8] Most cases of Prader-Willi syndrome are not inherited and many affected people have no history of the disorder in their families.[9] Prader-Willi syndrome is characterized at birth by weak muscle tone (hypotonia), feeding difficulties, poor growth, and delayed development.[10] Affected individuals develop an

extreme hunger beginning in childhood, which can lead to chronic overeating (hyperphagia) and obesity.[11] Typical characteristics of Prader-Willi syndrome include constant hunger and food seeking behaviors with an inability to feel satisfied.[12] Seeing or smelling food triggers extreme anxiety.[13] People with Prader-Willi syndrome also typically have mild to moderate intellectual impairments, learning disabilities, and difficulty sleeping.[14] Behavioral problems are also common, including temper outbursts, stubbornness, and compulsive behavior such as picking at the skin.[15] Prader-Willi syndrome is a spectrum disorder and the physicians and educational professionals confirm Q.M. falls somewhere along the more severe end of the continuum.[16]

There is no cure for Prader-Willi syndrome.[17] But physicians have identified various treatments including strict supervision of daily food intake (affected individuals rarely need more than 1,000–2,000 calories per day), growth hormone therapy, sleep treatments, physical therapy, behavioral therapy, medications, speech therapy, and special education.[18] Group homes offer necessary structure and supervision for adults with Prader-Willi syndrome by helping to avoid compulsive eating, severe obesity, and other health problems.[19]

### *Q.M. attends seventh grade at the District middle school (2018-2019 school year).*

Q.M. began to demonstrate the obsessive food-seeking behavior of Prader-Willi syndrome toward the end of elementary school.[20] Parents testified Q.M.'s behavioral and food-related issues began to intensify at home and at school when he entered middle school.[21] Q.M.'s father testified Parents began to lock their refrigerator and pantries at home by the time Q.M. entered sixth or seventh grade.[22] Q.M.'s father swore these steps did not work because Parents would still find food wrappers in Q.M.'s room and Q.M. eventually found out where they hid the keys.[23] Q.M. also began eating things he should not consume while at home, such as a container of cream cheese and a frozen casserole.[24]

4

Q.M. attended the District middle school for seventh grade with some academic and behavioral progress.[25] The District reevaluated Q.M.'s educational plan in January 2019 (midway through Q.M.'s seventh grade year) and concluded Q.M. read on a fourth-grade level.[26] The District provided Q.M. with a modified curricular in co-taught social studies and science classes and offered reading, writing, and mathematics instruction at his instructional levels.[27] The District also provided speech/language, physical, and occupational therapy to Q.M.[28]

### Q.M.'s February and May 2019 IEP for the eighth-grade year.

The District developed a new individualized education program (IEP) in February 2019 to be implemented through February 2020 of Q.M's eighth grade year.[29] The District's annual goals in the February 2019 IEP included reading comprehension (at a fourth grade level); written expression (responding to prompts using a rubric); functional mathematics skills (problem solving with a calculator); speech/language skills (articulation); physical therapy skills (gross motor activities); and occupational therapy skills (handwriting within boundaries, typing).[30] The District provided for instruction in the general education classroom for science, social studies and electives, but special education services for math, reading, and English in the special education classroom.[31] The District also planned to provide Q.M. with related services for occupational, physical, and speech/language support and extended school year services.[32]

The District through the IEP planned to provide Q.M. with one-on-one paraprofessional support to address his need for food security and other behavior issues and provided a website for the IEP team to review information on Prader-Willi syndrome.[33] Q.M.'s parents approved the District IEP.[34] Q.M. spent approximately 65% of his day in the regular classroom during his seventh grade year.[35] The District's IEP identifies six instances in the 2018-2019 school year where Q.M. exhibited disrespectful behaviors (defined as any time Q.M. became frustrated, angry,

cursed, screamed loudly, shoved, or refused to comply with adult instruction).[36] Teachers found Q.M. earned grades in the A to B range for all his classes at the end of his seventh grade year.[37]

The District also implemented an individualized health care plan in February 2019 confirming it knew of Q.M.'s "[r]isk for noncompliance with food management plan related to lack of ability to feel satiety" and included the District's goal to provide various interventions including having Q.M. only bring in food from home and not buy food at school, providing an adult monitor him in a discrete manner during lunch so he does not share or trade food, and educating staff members working with Q.M. on Prader-Willi syndrome.[38]

The District conducted a functional behavioral assessment in April 2019 which included multiple observations and an interview with the special education teacher. The District's assessment identified Q.M.'s behaviors of concern (verbal aggression, physically aggression toward objects, task refusal); antecedents to those behaviors (non-preferred or difficult tasks); and, consequences of the behaviors of concern (delay/escape, attention).[39]

The District revised Q.M.'s IEP in May 2019 to include a new behavioral goal to address his behaviors of concern.[40] Q.M.'s behavioral detail report for the 2018-2019 school year shows three incidents where the District disciplined Q.M. for behavioral outbursts.[41]

Q.M. returned to the District middle school for eighth grade in the 2019-2020 school year subject to the May 2019 IEP then in place. The District and Parents differ as to Q.M.'s eighth grade education. Parents contend Q.M.'s behavior at school became progressively worse from seventh to ninth grade.[42] The District answers Q.M. demonstrated variable performance in reading comprehension, written expression, and occupational therapy, but exhibited some growth in math, speech/language, physical therapy, and behavior as of the middle of his eighth-grade year in January 2020.[43]

### *Q.M.'s February and November 2020 IEP for the ninth-grade year.*

The District prepared a new IEP for Q.M. in February 2020 to be implemented through February 2021 of Q.M.'s ninth grade year.[44] Annual goals in the February 2020 IEP included reading comprehension (at instructional level); written expression (responding to prompts using a rubric from a decreased baseline over the earlier IEP); functional mathematics skills (problem solving with a calculator, on skills similar to those in the earlier IEP but with increased difficulty); speech/language skills (monitoring articulation); physical therapy skills (gross motor activities as in the earlier IEP); occupational therapy skills (identifying and managing emotions, typing with an increased baseline over the earlier IEP); and behavior (using coping skills as in the most recent IEP but with a slightly reduced expectation).[45] The District also offered speech and language therapy, occupational therapy, and physical therapy services.[46]

Program modifications and items of specially designed instruction included one-on-one paraprofessional support, modified content area materials, and preview of materials.[47] The District also provided for extended school year services but the Parents declined those extended school year services.[48] Q.M. remained in special education classes in reading, English, and math and regular education classes for all other classes and activities, including science and social studies for his eighth grade year.[49] The IEP identified fifty-seven instances of Q.M. exhibiting disrespectful behavior his eighth grade year as compared to the six instances during his seventh grade year.[50] The District's board certified behavior analyst Lauren Spera found this increase in behaviors "concerning."[51]

Q.M. spent approximately 65% of the day in the regular classroom as he did in seventh grade.[52] Q.M.'s parents approved the February 2020 IEP.[53] The District provided Q.M. the same

accommodations as the earlier IEP including one-on-one paraprofessional support to address his need for food security.[54]

The teachers again found Q.M. earned grades all in the A to B range at the end of his eighth grade year, but he received limited progress reporting in his February 2020 IEP goals because of the school closures due to the COVID-19 pandemic.[55] The pandemic caused the District to close in March 2020 through the end of the 2019-2020 school year.[56]

Q.M. returned to the District school for his ninth-grade year during the 2020-2021 school year. The Parents and District dispute Q.M.'s progress in ninth grade. Parents contend Q.M.'s behavior in school began to deteriorate in ninth grade.[57] The District maintains Q.M. never exhibited behavior difficulty in ninth grade regarding food, but agrees Q.M. exhibited increased difficulty with self-regulation and anxiety.[58] Q.M had multiples outbursts at school during his ninth grade year which included yelling, cursing, and threatening and the District responded by calling Parents to take Q.M. home on numerous occasions.[59]

The District revised Q.M.'s IEP in September 2020 to reflect Q.M.'s attendance at a different middle school at the start of Q.M.'s ninth grade year which provided in-person instruction five days per week (the school Q.M. previously attended remained close due to the COVID-19 pandemic).[60] Q.M.'s parents asked he return to the neighborhood school (the school Q.M. attended for seventh and eighth grade) after several weeks at the new school for the remainder of his year, and he did.[61]

The District conducted two IEP meetings in November 2020 and the team discussed Q.M.'s behavior at home and his Parents' concerns over Q.M.'s worsening behaviors.[62] Both the District and Parents concede Q.M. exhibited increased difficulty with self-regulation and anxiety at this time.[63] The IEP team discussed two days where Q.M. could not ride the bus home due to his

"heightened emotionality."[64] Q.M.'s mother testified on one occasion Q.M. disrupted the dismissal process so badly causing other students to almost miss their buses.[65] Parents also reported Q.M.'s increasingly difficult behaviors at home and shared their belief Q.M. dealt with underlying anxiety all day due to his progressing Prader-Willi syndrome.[66]

Parents raised the possibility of residential placement for Q.M during the November 2020 IEP meeting.[67] The District revised Q.M.'s IEP on November 13, 2020 to address his worsening behaviors after the meeting.[68] The District added a modification for "direct, systematic instruction in social skills" providing Q.M. for opportunities to apply his learned skills in authentic environments.[69] Parents dispute whether Q.M. made progress on these behavioral goals and contend it is impossible to know whether he made progress because the District produced a limited amount of behavioral data.[70]

### Q.M.'s February 2021 IEP for the tenth-grade year.

The District prepared an IEP for Q.M. in February 2021 with an implementation date of March 2021 through February 2022 of Q.M.'s tenth grade year.[71] Annual goals in the February 2021 IEP included reading comprehension (at a fourth grade level); written expression (paragraph writing independently but with pre-writing supports); functional mathematics skills (problem solving); speech/language skills (monitoring speech production and listener comprehension); physical therapy skills (gross motor activities similar to those in the prior IEP); and occupational therapy skills (identifying and managing emotions, bilateral coordination).[72] It provided for extended school year services and supplemental learning support with participation in the regular education environment for content area classes other than reading, written expression, and math like the previous IEP.[73] Q.M. would spend approximately 65% of the day in the regular classroom

as he did in seventh and eighth grade.[74] The District proposed to continue much of what it previously provided to Q.M. in terms of food security including: [75]

- One-on-one paraprofessional support for inclusion, academic differentiation, behavior, transitions, and food management;

- Two scheduled snack times for Q.M with food brought from home;

- Q.M. would not receive food from school unless coordinated in advance with Parents;

- IEP team would be trained by the Prader-Willi Syndrome Association (USE)'s Wyatt Special Education Advocacy Training on facilitating inclusion and addressing in-school behavioral challenges.

The District also continued to offer speech and language, occupational therapy, and physical therapy services.[76]

The IEP team planned to reconvene in the spring 2021 to continue discussing Q.M.'s transition to high school and created a transition plan which included meeting with a Central Bucks High School East representative in the spring, scheduling a tour of the school before the end of the 2020-2021 school year, and providing Q.M. with an opportunity to shadow a Central Bucks High School East student.[77] Parents expressed concerns during the February 2021 IEP meeting about the proposed transition options given Q.M.'s disability which requires him not to access food.[78] Parents also asked about the process for making out-of-district placements.[79] Parents ultimately shared their disapproval of the February 2021 IEP but consented to its implementation.[80]

The District conducted another functional behavioral assessment in April 2021 and identified Q.M.'s verbal noncompliance, verbal aggression and/or physical aggression toward objects, and physical aggression toward others as behaviors of concern.[81] The hypothesis developed in this functional behavioral assessment mirrored the April 2019 functional behavioral assessment—Q.M. engaged in verbal and physical aggression or refused to comply with directives to complete a non-preferred or difficult task to avoid or escape the task.[82]

The District also conducted another reevaluation report in April 2021 relying on information from Q.M.'s records and observations from a school psychologist, but Q.M. refused to participate in a cognitive assessment.[83] Q.M.'s academic achievement assessment now reflected very low scores in the reading (approximately second to third grade level), writing expression, spelling and math composites (approximately second grade level).[84]

The District's April 2021 reevaluation report also included an assessment where both the District and Parents rated Q.M.'s social, emotional, and behavioral functions through a set of rating scales.[85] Parents' ratings reflected clinically significant concerns with Q.M.'s hyperactivity, aggression, and withdrawal and at-risk concerns with anxiety, depression, somatization, atypicality, and attention problems, while the teacher ratings reflected clinically significant concerns only with Q.M.'s withdrawal and social skills and at-risk concerns with his depression, adaptability, leadership, and functional communication.[86] The April 2021 reevaluation report concluded Q.M. remained eligible for special education and his identified needs included improved reading comprehension, written expression, functional mathematics skills, independent self-regulation, language comprehension, speech intelligibility, and gross motor skills.[87]

### Parents notify the District of their intent to send Q.M. to the Latham Centers.

Parents notified the District of their intent to place Q.M. at the Latham Centers, an out-of-state residential placement, at public expense on May 3, 2021.[88] The Latham Centers serves children between the ages of eight and twenty-two with complex disabilities including Prader-Willi syndrome at a campus in Massachusetts which includes two dormitories, a clinical service building, and a main house with dining and nursing services.[89] It provides services twenty-four hours a day for every day of the year.[90]

The District responded four days later by scheduling another IEP meeting scheduled for May 13, 2021 to discuss a revised IEP for the upcoming tenth-grade school year to address Q.M.'s need for increased behavior management, independence, social engagement with peers, basic life skills, community skills, employability skills.[91] The IEP team recommended Q.M. attend Central Bucks High School West for his tenth grade year and participate in the employability class and community based instruction at the May 13 meeting.[92]

### District's revised May 2021 IEP for Q.M.'s tenth grade year.

The District issued a revised IEP after learning of the Parents' intent to move Q.M. to Latham Centers in May 2021 which provided for direct instruction in the special education classroom for reading, writing, math, social skills, self-regulation skills, employability skills (employability course), science, and social studies in order to provide smaller group environments and peers with whom Q.M. could practice social skills.[93] The District proposed Q.M. would be instructed in the general classroom only for physical education/health, one elective, homeroom, lunch, and community-based instruction.[94] Q.M. would spend approximately a third of his day in the regular classroom.[95] The IEP also included information from the District's April 2021 reevaluation report noting Q.M.'s reading skills, spelling skills, and math skills all fell in the very low range.[96] The District noted Q.M. only exhibited three behaviors of concerns from November 2021 to May 2021.[97] The District essentially offered the same accommodations as the earlier IEPs to address Q.M.'s need for a food secure environment, including: [98]

- One-on-one paraprofessional support for inclusion, academic differentiation, behavior, transitions, and food management;

- Two scheduled snack times for Q.M with food brought from home;

- Q.M. would bring food from home during lunches and will not buy anything from the cafeteria;

- Q.M. would not receive any food from school (lunch, special events, etc.);

- IEP team would be trained by the Prader-Willi Syndrome Association (USE)'s Wyatt Special Education Advocacy Training on facilitating inclusion and addressing in-school behavioral challenges.

Q.M.'s parents enrolled Q.M. at the Latham Centers on May 17, 2021.[99]  He had a difficult transition; the District and Parents agree Q.M. could be dangerous, appeared agitated and anxious, and had no interest in his physical appearance or other students upon his arrival at the Latham Centers in May 2021.[100] Parents admit Q.M. experienced a difficult transition during the first few months at the Latham Centers, which required the need for physical restraint.[101]  Q.M.'s challenging behavior included aggression, self-injurious behavior, food related security breaches, and medication refusals.[102] Parents shared a recommendation letter from Dr. Jennifer Miller, Q.M.'s endocrinologist, by August 2021 with the District confirming Q.M. should be placed in a specialized residential school to address his complex needs.[103] Endocrinologist Dr. Miller also noted Q.M's cognitive weaknesses and confirmed Q.M.'s increased behavioral challenges have gradually grown more problematic over time as his medical condition due to Prader-Willi syndrome worsened.[104]

### *Parents seek a due process hearing ten days after enrolling Q.M. at Latham Centers.*

Parents filed a due process administrative complaint on May 27, 2021 against the District alleging it failed "to provide a free, appropriate public education to [Q.M.], a ninth-grade student in the District."[105] Parents sought (1) compensatory education to the maximum extent allowed by law; (2) injunctive and declaratory relief, reimbursement for services obtained, and reimbursement for tuition and costs of unilateral placement of Q.M. at Latham Centers; (3) finding that District's actions violated Section 504 and Title II of the ADA and resulted in  discriminatory denial of access to education; (4) reimbursement for attorneys' fees and other costs, including expert witness fees; and (5) other relief the Hearing Officer deems appropriate and just.[106]

***Q.M. attends the Latham Centers for tenth grade (2021-2022 school year).***

Q.M. spent his tenth-grade year (2021-2022 school year) at the Latham Centers. The number of disruptions greatly decreased beginning in October 2021 after Q.M. adjusted to life at the Latham Centers.[107] Q.M. has also not been physically restrained at Latham Centers since September 2021.[108]

Q.M.'s February 2022 comprehensive treatment plan from Latham Centers provides various goals which he continues to meet including maintaining a healthy weight and lifestyle, decreasing disruptive behaviors, and engaging with peers.[109] Q.M. has exhibited growth at the Latham Centers and participates in multiple activities such as Special Olympics and various community outings.[110]

Latham Centers also provides Q.M. with food security and a specialized diet of 1,400 calories per day.[111] Q.M. had two food-related security breaches between November 2021 through February 2022.[112] The records we received indicate Q.M. had eight total food-related security breaches while at the Latham Centers.[113] Parents maintain these mostly included unauthorized possession of food in Q.M. residence, usually authorized snacks from the night before which Q.M. kept in his room to eat later.[114]

Q.M. progressed academically at Latham Centers. Q.M.'s February 18, 2022 quarterly meeting at the Latham Center shows progress on his math, reading comprehension (fourth grade level), and writing goals.[115] Latham Centers conducted a functional behavior assessment on November 29, 2021 identifying behaviors of concern (noncompliance and aggression) and recommended strategies to address these behaviors such as implementing consequences for target behaviors, encouraging independent completion of work, teaching replacement behaviors, and

instructing Q.M. in a clear and concise manner.[116] Latham Centers implemented an updated behavior support plan on December 10, 2021 to address Q.M.'s concerning behaviors.[117]

Parents contend Q.M.'s progress report as of March 2022 shows he is reading at an early to mid-fourth grade level, performing at an early fourth grade level at math, and has progressed both socially and emotionally while at the Latham Centers.[118] The District denies Q.M. has progressed; it asserts Q.M.'s coping skills have regressed.[119]

### Due process hearing and Hearing Officer Skidmore's January 15, 2022 decision.

Hearing Officer Cathy A. Skidmore, Esquire presided over a four-day due process hearing beginning on October 12, 2021. She evaluated the credibility of testimony from ten witnesses including Q.M.'s parents, Q.M.'s endocrinologist, District personnel, and Latham Centers's personnel.[120]

Dr. Jennifer Miller is an endocrinologist and a leading researcher and physician in the field of Prader-Willi syndrome. She treated Q.M. for the past ten years. Dr. Miller testified Q.M. needs "completely restricted access to food" to manage his Prader-Willi syndrome.[121] She testified Q.M. developed more behavioral issues over the years and has become more hyperphagic (food obsessed with an unrelenting appetite) which is typical of Prader-Willi syndrome.[122] Dr. Miller became concerned about Q.M.'s educational experience beginning in 2018 when Parents reported to her Q.M. academically regressed because although Q.M. is cognitively delayed "you should never see regression of academic skills" in individuals with Prader-Willi syndrome.[123] Dr. Miller never spoke with Q.M.'s teachers or any District personnel but based her opinions on her own experiences with Q.M and the information she obtained from his parents.[124] She opined "[Q.M.] is not able to get an adequate, safe and effective education in his current school system."[125] She opined placement at Latham Centers is necessary for Q.M. to receive an appropriate education.[126]

She explained Latham Centers can address Q.M.'s problems because it specializes in Prader-Willi syndrome and "keep[s] food completely away from the educational setting."[127]

Dr. Dana Henning testified for Parents and issued a 163 page report as an expert witness in the education of students with significant disabilities and complex support needs.[128] Dr. Henning has experience in the education of individuals with Prader-Willi syndrome and had the opportunity to conduct a virtual observation of Q.M. at the District school in April 2021, met with Q.M. in the community, and observed him at Latham Centers.[129] She also reviewed the District's IEPs.[130] She opined much of Q.M.'s life is affected by Prader-Willi syndrome as he is "constantly bothered by being attracted or distracted by food stuff" and "it's always on his mind[.]"[131] Dr. Henning explained food security is a common approach to working with people with Prader-Willi syndrome because "the idea of making an environment food secure makes it clear to a person after a while that there just is no food to be had here" and "it relieves the anxiety of constantly being on the lookout for food[.]"[132]

Q.M.'s parents also testified at the hearing. Q.M.'s father testified Prader-Willi syndrome "affects every single part of [Q.M.'s] life."[133] He described how it affects Q.M. physically and cognitively.[134] Q.M.'s father explained he thought they "were out of the woods early" because Q.M. did not exhibit the food seeking behaviors early in his life, but beginning in seventh grade Q.M. started to display food seeking behaviors such as sneaking food, stealing food, and "everything revolves around food."[135] Q.M.'s father testified Parents began to lock their refrigerator and pantry by the time Q.M. entered sixth or seventh grade.[136] Q.M.'s father testified around this time in seventh, eighth, and ninth grade, Q.M.'s behavior in school "really started to deteriorate" and despite having a one-on-one aid Q.M would come home with food in his pockets and backpack.[137] Q.M.'s mother similarly testified how the complexities of Q.M.'s syndrome

"ha[ve] grown exponentially from elementary school to middle school and now onto high school."[138]

Latham Centers's director of program marketing and admission Brittni Kliment testified.[139] She explained Latham Centers charged $280,000 for fiscal year 2022. It provides residential, educational, vocational, health, and clinical services and currently serves about forty-four students who all live on campus.[140] She explained Latham Centers is not a mental health facility but is licensed through the Department of Elementary & Secondary Education in Massachusetts and the Department of Early Education and Care.[141] Latham Centers is a 365-day-a-year program with a 216-day school program.[142]

Parents also called the director of Prader-Willi syndrome services at the Latham Centers Patrice Carroll to testify.[143] Ms. Carroll has held this position for eleven years. She testified Q.M. presents with severe Prader-Willi syndrome and "absolutely needs a food secure environment."[144] She explained at Latham Canters "there's no food anywhere where [Q.M.] can get to" because "[t]he kitchen's locked" and teachers do not walk around with coffee or have food in their desks and "if we're eating, it's the same food that [the students are] eating at the same time."[145] She testified although Q.M.'s had a rough transition to Latham Centers characterized by refusal behaviors, physical aggression, and a lot of disruption and swearing, this is not unusual and Ms. Carroll witnessed Q.M. start to make "tremendous strides" beginning in July 2021.[146]

Hearing Officer Skidmore also evaluated testimony adduced by the District. Shara Smith is a supervisor of special education for the Central Bucks School District. She became familiar with Q.M. at the beginning of his ninth-grade year. She testified about the proposed IEPs for the 2021-2022 school year.[147] Lauren Spera is a board-certified behavior analyst for Central Bucks School District. She has known Q.M since the end of January 2019. She testified for the District

about the functional behavior analysis of Q.M. she conducted in April 2019.[148] Dr. Kevin Shillingford is the principal of Holicong Middle School where Q.M. attended for approximately three years for seventh grade, eighth grade (although cut short due to COVID-19 school closures), and part of ninth grade. He testified for the District describing his interactions with Q.M. as generally positive and he never encountered Q.M. sneaking off to the cafeteria to sneak or steal food.[149] But Dr. Shillingford described three instances where Q.M.'s behavior escalated to the point where he had to get involved during Q.M.'s ninth grade year.[150] Chris Rittenhouse, a special education teacher and the athletic director at Holicong Middle School, also testified for the District. He has known Q.M. since fifth grade.[151] Mr. Rittenhouse testified Q.M. helped him with athletics as an informal "athletic assistant" beginning in seventh grade through his ninth grade year.[152] Q.M. would sit at the score table during games, gather sports equipment, and carry the medical kit for about two days a week with Mr. Rittenhouse.[153] Mr. Rittenhouse testified he did not see Q.M. have problems with food in this role because Q.M. did not have access to food on the sidelines or at the scoring table, but Q.M would usually bring a snack from home.[154] Mr. Rittenhouse testified Q.M.'s mother made Mr. Rittenhouse aware of Q.M.'s food issues during Q.M.'s seventh grade year.[155] Mr. Rittenhouse also became Q.M.'s special education manager during Q.M.'s ninth grade year, taught him for math and co-taught his science class and testified Q.M. did not have difficulty with food management during his ninth grade year.[156] But Mr. Rittenhouse acknowledged Q.M.'s ninth grade year occurred in the midst of the COVID-19 pandemic and "we didn't have lunches per se" as the students went through all their classes with a few wellness breaks and then went home at 1:30 p.m.[157]

Hearing Officer Skidmore found the testimony of Parents and District professionals persuasive and "accorded significant weight" as to their understandings of Q.M. given their

significant experience and expertise.[158] She found the testimony of Dr. Miller "cogent and compelling with respect to [Q.M.'s] medical condition and needs given her extension qualifications."[159] She found Dr. Henning's testimony convincing as to Q.M.'s medical condition, but found her "lengthy report and opinion on the District's program" unconvincing because Dr. Henning did not base it on any information obtained from the District; she instead focused on a single remote observation of Q.M. and appeared overly critical of an asserted lack of data and details in the District records including IEPs which Officer Skidmore found would not have been helpful.[160]

Hearing Officer Skidmore issued her decision on January 15, 2022 finding: (1) the District did not deny Q.M. a free appropriate public education for the 2019-2020 and 2020-2021 school years (eighth and ninth grades); (2) the District failed to offer Q.M. a free appropriate public education for the 2021-2022 school year (tenth grade); and (3) Parents are entitled to reimbursement of 85% of the tuition and related costs, including residential costs, for the 2021-2022 school year at the Latham Centers.[161] Hearing Officer Skidmore did not include the tuition costs for May through August 2021 without explanation.  Hearing Officer Skidmore addressed the Section 504 of the Rehabilitation Act and the Americans with Disabilities Act claims on the same grounds as the IDEA claims and did not provide a separate analysis for those claims.[162]

### Parents reject the District's March 2022 IEP.

The District and Parents agreed to meet on March 10, 2022 to discuss Q.M.'s eleventh grade IEP for the 2022-2023 school year.[163] The District did not have Q.M.'s updated information or records since he had been at Latham Centers for about ten months.[164] The District sought Parents' written permission to obtain those records from the Latham Centers on February 3, 2022.[165] The District still had not obtained Parents' written permission or received any of Q.M.'s

records a month later.[166] Parents eventually sent the District Q.M.'s draft IEP but did not send the other records the District had requested two days before the IEP meeting.[167] The District held the IEP meeting on March 10, 2022 to present the draft IEP to the District's IEP team, Parents, and legal counsel.[168] Parents expressed concerns during the meeting about Q.M.'s access to food and indicated no part of Q.M.'s education should focus on food, food shopping, or food preparation.[169] Parents also expressed concern with the one-on-one aid since Q.M. does not have one-on-one support at Latham Centers.[170]

The District again requested records from Parents on March 11, 2022 after the IEP meeting, but before the District finalized the IEP.[171] Q.M.'s mother responded the same day she would not share the documents in advance of the upcoming meeting between the District and Latham Centers scheduled for March 14, 2022.[172] The District received the November 2021 functional behavioral assessment and progress report data from Q.M.'s mother after the meeting.[173]

The District sent a final proposed IEP to Parents on March 25, 2022 taking into account Parents' concerns about the draft IEP and the additional information from Latham Centers.[174] The District proposed Q.M. would participate in a functional curriculum emphasizing self-help, daily living skills, self-advocacy/self-determination, and recreation/leisure activities.[175] Q.M. would receive direct instruction in special education classes for reading, writing, math, social skills, self-regulation skills, employability skills, science, social studies, life skills, and hygiene skills and would receive instruction in the general education classroom only for physical education, lunch, and community-based instruction.[176] Q.M. would spent approximately 19% of his day in the regular classroom.[177] The District in the IEP represented: "[Q.M.] cannot be around other students who are eating or preparing food in the classroom. [He] may get frustrated and yell[.]"[178] The District provided steps to address Q.M.'s need for a food secure environment:

- Food security by locking cabinets with food and locking refrigerators across all classroom settings;

- One-on-one paraprofessional support for inclusion, academic differentiation, behavior, transitions, and food management;

- Two scheduled snack times for Q.M with food brought from home;

- Q.M. would bring food from home during lunches and will not buy anything from the cafeteria;

- An adult to monitor Q.M. during lunch in a discrete manner to ensure no sharing or trading of food;

- Parents and District would discuss strategies for managing food in a variety of settings (field trips, extra-curricular activities, etc.) as needed;

- Parents may attend field trips if desired; and,

- IEP team would be trained by the Prader-Willi Syndrome Association (USE)'s Wyatt Special Education Advocacy Training on facilitating inclusion and addressing in-school behavioral challenges.[179]

Parents sent the District their signed notice disapproving of the March 2022 IEP on March 31, 2022, and then provided for the first time Q.M.'s written comprehensive treatment plan from the Latham Centers.[180] The District could not and did not consider the Latham Centers's plan in its IEP proposal since Parents sent the information to the District after it already finalized the March 2022 IEP.[181] The District swears Parents still have not executed a release of records so it can access Q.M.'s full educational records at Latham Centers and Parents have not allowed the District the ability to speak with Q.M.'s teachers as of June 30, 2022.[182]

### The District and Parents sue each other.

The District sued Q.M. and his parents seeking to overturn the portion of Hearing Officer Skidmore's decision ordering the District to reimburse Parents for 85% of tuition for the 2021-2022 school year and to find the May 2021 IEP provided Q.M. a free appropriate public education.[183] The Parents responded by suing the District for compensatory education for the 2019-

2020 and 2020-2021 school years, additional tuition reimbursement for the 2021-2022 school year, and attorneys' fees and costs and compensatory damages under Section 504 of the Rehabilitation Act, the Americans with Disabilities Act, and the Individuals with Disabilities Education Improvement Act.[184] Q.M.'s Parents also challenge the District's proposed individualized education plan for this upcoming school year (2022-2023).[185]

## II. Analysis

The District, Q.M., and his parents ask us resolve issues arising from Hearing Officer Skidmore's January 15, 2022 findings as to a free and appropriate public education for Q.M. during Q.M.'s three earlier school years. They also ask we address whether the District's IEP for school year 2022-2023 provides an IDEA compliant proposal for a free appropriate public education without the benefit of a hearing officer's expertise arguing the issues are substantially similar as the three earlier years. We will address the issues in chronological order starting with the three completed school years. The parties' dispute largely centers around whether the District can provide sufficient food security to enable Q.M. to receive a meaningful education.

### A. We affirm Hearing Officer Skidmore's analysis for the three earlier years except amending the findings to award 85% reimbursement of tuition incurred from May 2021 to September 2021.

We first address Hearing Officer Skidmore's findings as to the 2019-2020, 2020-2021, and to 2021-2022 school years. The District moves for judgment on the administrative record, challenging Hearing Officer Skidmore's decision as to 85% reimbursement for the 2021-2022 school year because: (1) the Hearing Officer failed to apply the first prong of the *Burlington-Carter* tuition reimbursement analysis; (2) the Hearing Officer failed to conduct the least restrictive environmental analysis; and (3) the Hearing Officer erred in finding the Latham Centers an appropriate placement.[186] Parents respond: (1) the Hearing Officer correctly applied the *Burlington-Carter* analysis; (2) Parents' placement is not required to offer education with children

who do not have disabilities to the maximum extent appropriate; (3) the Latham Centers is an appropriate placement; (4) the IEP offered by the District on March 10, 2022 is inappropriate; and (5) compensatory damage are available as a remedy.[187]

The District admits it did not provide total food security during the 2019-2020 and 2020-2021 school years. But it maintains it "provided specialized staffing to prevent Q.M. from accessing food" while at the District school along with other services to provide Q.M. with an appropriate education.[188] The District acknowledged it will not provide Q.M. total food security if he returns to the District for high school but will take steps to provide Q.M. a food secure environment by, among other things, providing a one-on-one aid to monitor Q.M. to ensure he only eats food he brings from home and does not share or trade food, lock the cabinets and refrigerators containing food in Q.M.'s classrooms, and provide training for staff on Prader-Willi syndrome.[189]

Parents also move for judgment on the administrative record arguing (1) Q.M. is entitled to compensatory education for the District's failure to provide an appropriate education during the 2019-2020 and 2020-2021 school years; (2) the Hearing Officer correctly found Q.M. needs residential placement at Latham Centers to receive an education benefit; and (3) Parents are entitled to attorney fees and costs as prevailing parties.[190] The District responds: (1) Parents are not entitled to compensatory education for the preceding two years; (2) the Hearing Officer erred in concluding Q.M. needs residential placement for the 2021-2022 school year; (3) Parents are not entitled to relief under Section 504 of the Rehabilitation Act or the Americans with Disabilities Act; (4) Parents' claims regarding the March 2022 IEP is not briefed; and (5) Parents are not a prevailing party.[191]

We apply a "modified d*e novo* review" where we give "due weight" to Hearing Officer Skidmore's factual findings when considering the parties' appeals from Hearing Officer Skidmore's decision.[192] Under this standard, if we depart from Hearing Officer Skidmore's findings of fact, we must explain why since the factual findings are considered prima facie correct.[193] We afford Hearing Officer Skidmore's determinations "due special weight" when she evaluates live testimony and determines one witness is more credible than another witness.[194] We must accept Hearing Officer Skidmore's credibility determinations unless the non-testimonial, extrinsic evidence in the record justifies a contrary conclusion.[195] We cannot substitute our own notions of sound educational policy for those of local school authorities.[196]

If we hear additional evidence, we are "free to accept or reject the agency findings depending on whether those findings are supported by the new, expanded record and whether they are consistent with the requirements of the Act."[197] We review Hearing Officer Skidmore's legal conclusions under the *de novo* standard.[198]

The party challenging Hearing Officer Skidmore's decision bears the "burden of persuasion . . . as to each claim challenged."[199] We must base our decision on the preponderance of the evidence in evaluating the arguments of the party challenging Hearing Officer Skidmore's findings.[200]

We studied the administrative record and the parties' supplemental administrative record.[201] We find Hearing Officer Skidmore did not err in finding the District provided Q.M. a free appropriate public education for the 2019-2020 and 2020-2021 school years and deny the Parents' motion to reverse her findings for those years. We find the District has not met its burden in showing it provided a free appropriate public education for the 2021-2022 school year and thus

Hearing Officer Skidmore did not err in awarding tuition reimbursement for the 2021-2022 school year.

### 1.    The IDEA framework.[202]

Congress enacted the IDEA to "protect[ ] the rights of disabled children by mandating that public educational institutions identify and effectively educate those children, or pay for their education elsewhere if they require specialized services that the public institution cannot provide."[203] States receiving federal education funding must make available a free and appropriate public education to all children with disabilities residing within their borders.[204] A free and appropriate public education includes both "special education" and "related services."[205] The obligation to provide a free and appropriate public education is substantially the same under Section 504 of the Rehabilitation Act of 1973 and the American with Disabilities Act.[206]

The District can meet its free and appropriate public education obligation through the development and implementation of an IEP, which is the "centerpiece of the statute's education delivery system for disabled children."[207] An IEP is "the means by which special education and related services are 'tailored to the unique needs' of a particular child."[208] An IEP requires a specific statement of Q.M.'s present abilities, goals for improvement of Q.M.'s abilities, services designed to meet those goals, and a timetable for reaching the goals by way of the services.[209]

The IEP must be "reasonably calculated to enable [Q.M.] to make progress appropriate in light of [his] circumstances."[210] The state, through the District, "is not required to maximize the potential of every handicapped child," but "it must supply an education that provides 'significant learning' and 'meaningful benefit' to the child."[211] The District must provide an IEP in the least restrictive environment possible meaning the District must establish "procedures to assure that, to the maximum extent appropriate, children with disabilities . . . are educated with children who are

not disabled[.]"[212] We apply a two-part test for assessing compliance with the least restrictive environment requirement: (1) we must determine "whether education in the regular classroom, with the use of supplementary aids and services, can be achieved satisfactorily[;]" and (2) if we find  placement outside of a regular classroom is necessary for Q.M.'s educational benefit, we must evaluate "whether the [District] has mainstreamed [Q.M.] to the maximum extent appropriate, i.e., whether the school has made efforts to include the child in school programs with nondisabled children whenever possible."[213]

If the District cannot provide a free and appropriate public education to Q.M. but a private school could provide a free and appropriate public education, the District may be responsible for reimbursing Parents for the private school costs.[214]

### 2.    Congress's IDEA purposes applied to students with Prader-Willi syndrome.

The parties did not offer authority on how courts or commentators apply Congress's IDEA purposes to students living with Prader-Willi syndrome.  We found, as of today, limited references to Prader-Willi in the IDEA context.[215]  Judge Robreno affirmed the decision of the hearing officer and held the district provided a student with Prader-Willi syndrome a free appropriate public education in *K.C. ex rel. Her Parents v. Nazareth Area School District*.[216] The parents claimed the district denied various services to their daughter including physical therapy, occupational therapy, and executive functioning services.[217] But the parents before Judge Robreno did not argue their daughter's need for food security because parents never claimed their daughter had food-related issues.[218]  We face a much different evidentiary record.

Chief Judge Waverly Crenshaw held a school district failed to appropriately meet the needs of a student with Prader-Willi syndrome in *S.H. v. Rutherford County School*.[219] But he found the district school could provide the student with a free appropriate education with "a bit of training

and some tweaking of her IEP."[220] In *S.H.*, like in *K.C.* before Judge Robreno, the parents did not claim the student needed total food security to obtain a meaningful education and instead focused on the student's behavioral issues stemming from Prader-Willi syndrome.[221]

We are particularly guided by Judge Matsch's extensive analysis of the food security issues for a student living with Prader-Willi syndrome and the benefits offered by the Latham Centers compared to a school district's IEP six years ago in *Zachary v. Sch. Dist. No. 1 for the City & Cnty. of Denver.*[222] Judge Matsch found the parents could not obtain reimbursement for the Latham Centers's services when the Colorado district's IEP for a student with Prader-Willi syndrome provided a free appropriate public education reasonably calculated to enable him to receive an educational benefit within the least restrictive environment.[223]

Parents in *Zachary* placed their son at the Latham Centers and then sought reimbursement claiming the district's IEP failed to provide the student with a free appropriate public education.[224] The administrative law judge denied the parents' claim and concluded the district prepared an IEP "reasonably calculated to provide meaningful educational progress" for the student which the parents rejected by withdrawing their son from school and unilaterally placing him at Latham Centers his ninth grade year.[225]

The student previously attended middle school at the district where he made academic progress although did not perform at grade level.[226] Both the district and the student's parents acknowledged the student's behavioral issues resulted in his admission to a hospital on both an inpatient and outpatient treatment basis his eighth grade year.[227] The district in *Zachary* provided various accommodations to address the student's Prader-Willi syndrome including, among others:[228]

- All paraprofessionals, teachers, and staff would be highly trained about student's diagnoses, the importance of food security, and other relevant information;

27

- More than one paraprofessional would be trained to support the student;

- The student would be provided time and a safe place to "regroup and process" with appropriate staff to support him;

- Plans would be created for application across all environments;

- Plans would be provided that could be shared with the student;

- The district would consult with the student's in-home therapists and other providers;

- Food security would be provided in the classroom and across all settings student would access, supported by a trained 1:1 adult supervisor;

- Staff would be trained in how to support student in the event of a food security breach, including providing a safe place to debrief him if necessary;

- Student would be provided a "reverse inclusion" lunch (he would bring his lunch from home), which would occur in one of the classrooms; lunch would be supervised by a paraprofessional; other appropriate students would be invited to join him and provide an opportunity to practice social skills;

- Student would be supported by two paraprofessionals at all times, both trained to support him through any circumstances—one would be responsible for clearing an area of food (being consumed by students, for example), waste, and debris prior to student's movement through the footprint and the second would accompany student throughout the day to ensure physical food security;

- At the beginning of the day, the paraprofessionals stationed at the school would receive a radio call signaling the bus transporting student to school is en route, allowing them to clear the entrance area of any students who might be eating, food waste, etc.

The parents in *Zachary* rejected the proposed IEP after multiple IEP meetings and placed the student at the Latham Centers.[229] Judge Matsch found the IEP "reasonably calculated to provided total food security" for the student.[230] He also held a number of factors undermined the testimony of parents' witnesses who testified the district could not provide a free and appropriate public education for the student given the short time the witnesses spent with the student, their

differing notions of "total food security," and their lack of educational experience.[231] Parents ultimately failed to prove by a preponderance of the evidence the district violated IDEA.[232]

3.      **Hearing Officer Skidmore properly found the District provided Q.M. with a free appropriate public education for the 2019-2020 and 2020-2021 school years.**

Hearing Officer Skidmore found the District provided Q.M. with a free and appropriate public education for the 2019-2020 (eighth grade) and 2021-2022 (ninth grade) school years. Whether the District fulfilled its free and appropriate public education obligation is a question of fact.[233] Because Parents challenge the Hearing Officer's decision, they bear the burden of showing the District failed to offer an IEP "reasonably calculated to enable [Q.M.] to make progress appropriate in light of the [his] circumstances."[234] We "determine the appropriateness of an IEP as of the time it was made, and should use evidence acquired subsequently to the creation of an IEP only to evaluate the reasonableness of the [District's] decisions at the time that they were made."[235] We find the District did not deny a free and appropriate public education to Q.M. during the 2019-2020 and 2020-2021 school years giving "due weight" to Hearing Officer Skidmore's findings under the modified *de novo* standard.

Q.M.'s IEPs for Q.M.'s eighth grade year identified Q.M.'s academic, behavioral, social, emotional, and post-secondary transition needs.[236] The District developed the February 2019 IEP and revised it in May and again in August 2019 to be implemented through February 2020 of Q.M.'s eighth grade.[237] Q.M. made variable progress as of January 2020 in reading comprehension, written expression and occupation therapy but exhibited growth in math, speech/language, and physical therapy.[238]

The District then developed the February 2020 IEP during Q.M.'s eighth grade year to be implemented through February 2021 of his ninth grade year which identified specific academic

goals and demonstrated ways in which Q.M. had progressed from the previous year.[239] The District provided Q.M. with a modified curriculum for science, social studies, and elective class, which occurred within the general education setting.[240] Q.M. received special education services for math, reading, and English along with speech/language therapy, occupational therapy, and physical therapy.[241]

Parents argue the IEPs provided no instruction in adaptive behavior.[242] This is incorrect. The District's IEP for the 2019-2020 school year include instruction in self-regulation skills, gross motor skills, coping skills, and communication skills.[243] The District also implemented a point sheet to involve Q.M. in managing his behaviors and reward him for exhibiting expected behaviors to address Q.M.'s difficult behaviors which increased from six instances in seventh grade to fifty-seven instances in eighth grade.[244] The District also identified transition goals based on Q.M.'s interest in public safety.[245] Q.M. received grades in the A to B range by the end of the 2019-2020 school year.[246]

Q.M.'s IEPs developed for his ninth grade school year also addressed his academic, behavioral, social, emotional, and post-secondary transition needs.[247] Q.M. continued to receive instruction with the general education population for science, social studies, and electives, but received direct, small group instruction in math, reading, and English and direct instruction in self-regulation, social, and executive functioning skills.[248] The District also provided for paraprofessional support for inclusion, academic differentiation, transitions, behavior, and food management.[249]

Hearing Officer Skidmore correctly reviewed the evidence and determined the District appropriately addressed Q.M.'s needs enabling him to make progress during the 2019-2020 and 2020-2021 school years.[250] Although Hearing Officer Skidmore acknowledged Parents may hope

for more progress, the progress must be assessed based on Q.M.'s unique circumstances.[251] Q.M. still managed to progress under the District's IEP until the end of his ninth-grade year when his Prader-Willi syndrome worsened, and his related behaviors increased.

Parents failed to show the District denied Q.M. a free and appropriate public education during his eighth and ninth grade years. We need not consider the Parents' claim for compensatory education.

### 4. Hearing Officer Skidmore did not err in finding the District failed to provide a free and appropriate public education and awarding 85% tuition reimbursement the 2021-2022 school year.

Hearing Officer Skidmore found the District failed to provide Q.M. with a free and appropriate public education for the 2021-2022 school year and awarded 85% tuition reimbursement.[252] Whether the District fulfilled is free and appropriate public education obligation is a question of fact.[253] The District bears the burden of persuasion in showing it provided Q.M. with a free appropriate public education because it challenges the Hearing Officer's decision.[254] We find the District failed to meet this burden as to the 2021-2022 school year after giving "due weight" to Hearing Officer Skidmore's findings of fact.

### a. Hearing Officer Skidmore's decision meets the *Burlington-Carter* tests.

Q.M. may be enrolled in an appropriate private school and the District may be obligated to reimburse parents for private tuition expenses if the District first fails to offer a free and appropriate public education.[255] IDEA authorizes tuition reimbursement for parents who unilaterally decide to place their child in an out-of-district school if the IEP proposed by the District failed to offer the child a free and appropriate public education and the placement the parents chose is proper under the IDEA.[256] Under the *Burlington-Carter* test, Parents are eligible to receive private tuition reimbursement if: "(1) the public school did not provide a [free and appropriate public education];

(2) placement in a private school was proper; and (3) the equities weigh in favor of reimbursement."[257] To properly provide a free and appropriate public education, the District must develop an IEP "reasonably calculated to enable [Q.M.] to make progress appropriate in light of the [Q.M.'s] circumstances."[258]

### (1) The Hearing Officer properly analyzed the facts under the first *Burlington-Carter* test.

Hearing Officer Skidmore applied prong one of the *Burlington-Carter* analysis. She found "the record preponderantly establishes that Student's presentation as of May 2021 could not be met in a District high school for the fall of 2021."[259] Hearing Officer Skidmore found Q.M.'s condition had become more severe over time and by the fall of 2020, both the Parents and District observed behavioral regression and Q.M.'s needs could no longer be met by the District's IEP.[260] Hearing Officer Skidmore reasoned:

> The testimony of Student's endocrinologist as to Student's medical needs, coupled with the testimony of Private Placement professionals, leads to the inescapable conclusion that Student [needs] a structured, food secure, residential environment that includes care 24 hours a day, 365 days a year, focused on daily living skills and developing coping and emotional regulation skills in order for Student to derive benefit from, and receive, an education. As such, Student's medical needs are not segregable from, but rather are part and parcel of, the specially designed instruction Student requires based on Student's unique circumstances.[261]

Parents are entitled to tuition reimbursement only if we conclude, first, "public placement violated [the] IDEA."[262] Although Officer Skidmore's written decision did not evaluate prong one of the *Burlington-Carter* analysis in great detail, upon reviewing the record, we consider the appropriateness of the February 2021 IEP and the revised May 2021 by evaluating Q.M.'s abilities, the IEPs' goals for improvement of Q.M. abilities, and the services designed to meet those goals.

The parties appear to dispute which IEP is at issue—the February 2021 IEP or the revised May 2021 IEP.[263] We find the District's February 2021 IEP to be the final IEP and our ultimate

focal point, but we will also evaluate the revised May 2021 IEP which provided more information about Q.M.'s transition to high school.

Parents rejected the February 2021 IEP which like the February 2020 IEP provided Q.M. with direct instruction in the special education classroom for reading, writing, math, and social/self-regulation skills, but instruction in the general education classroom for all other instruction and activities, including science, social studies and electives.[264] The February 2021 IEP like the previous IEPs offered paraprofessional support for inclusion, academic differentiation, transitions, behavior, and food management along with speech and language, occupational therapy, and physical therapy services.[265] The team implemented a transition plan to prepare Q.M. for high school, which included meeting with a Central Bucks High School East representative in the spring, scheduling a tour of the school, and providing Q.M. with an opportunity to shadow a Central Bucks East student.[266] Q.M's mother expressed concerns about transition options given Q.M.'s disability since he cannot have access to food during these opportunities during the February 2021 IEP meeting.[267] Q.M.'s parents ultimately indicated their disapproval to the February 2021 IEP, which led to the revised May 2021 IEP.[268]

The IEP team met and issued a revised May 13, 2021 IEP after Parents properly gave the District notice they intended to place Q.M. in a private residential placement.[269] The District through the revised IEP sought to address Q.M.'s need for increased behavior management, independence, social engagement with peers, basic life skills, community skills, and employability skills.[270] The District recommended Q.M. attend Central Bucks High School West for his tenth grade year and participate in the employability class and community based instruction.[271]

The May 2021 revised IEP provided for direct instruction in the special education classroom for reading, writing, math, social skills, self-regulation skills, employability skills

(employability course), science, and social studies in order to provide smaller group environments and peers with whom Q.M. could practice social skills.[272] It only provided instruction in the general classroom for physical education/health, one elective, homeroom, lunch, and community-based instruction so Q.M. would only spend 33% of his day in the regular classroom.[273] The revised IEP also provided information from the District's April 2021 reevaluation report which indicated Q.M.'s reading, math, and spelling skills fell in the very low ranges.[274]  The revised May 2021 IEP largely mirrors the February 2021 IEP in terms of food security providing Q.M. with a one-on-one paraprofessional, two scheduled snack breaks, and instructions on how he cannot receive food from school.[275]

Neither the February 2021 IEP nor the revised May 13, 2021 IEP is "reasonably calculated to enable [Q.M.] to make progress appropriate in light of the [his] circumstances" based on the record.[276] Q.M. began to regress in various subject areas as he approached high school despite progressing academically in elementary school and middle school. For example, in January 2019, the District's reevaluation report concluded Q.M. read on a fourth-grade level, but by April 2021 the District's reevaluation report concluded Q.M.'s reading and math skills fell in the very low range (approximately second to third grade level for reading and second grade level for math).[277] Q.M.'s behavior also regressed from seventh to ninth grade.[278] Q.M. exhibited increased difficulty with self-regulation and anxiety.[279]

Both the February 2021 and May 2021 IEPs also fail to offer Q.M. a more food secure environment than his previous IEPs, which based on Q.M.'s worsening condition, is necessary for him to obtain a meaningful education at school. The February 2021 IEP provided Q.M. would join the general education population for lunch, and although he has an aid to ensure he did not steal or trade food, he would still be surrounded by the presence of food which is extremely distracting

and limits his ability to learn and progress.[280] The sights and smells coming from the cafeteria throughout the day would undoubtedly disrupt his learning given his worsening condition as would teachers and students eating in the hallways or during unstructured time.

Our review of the 2021 IEPs are governed by a different standard of review and significantly less student protections than Judge Matsch addressed in *Zachary*. Judge Matsch found *parents* failed to meet their burden in proving by a preponderance of the evidence the district violated IDEA by failing to develop an IEP reasonably calculated to provide a student with Prader-Willi syndrome a meaningful educational benefit.[281] Judge Matsch found the IEP in *Zachary* "reasonably calculated to provided total food security."[282]

The proposed IEP in *Zachary* provided much more than what the District offered in 2021-2022 in terms of food security.[283] The district in *Zachary*, by way of example, provided: food security in the classroom and across all settings student would access; support by a trained 1:1 adult supervisor; a safe place for the student to regroup and process; and two paraprofessionals responsible for clearing an area of food, waste, and debris prior to student's movement throughout the school and accompanying student throughout the day to ensure physical food security.[284]

Judge Matsch also found a number of factors "undermined" the testimony of parents' witness, a psychiatrist specializing in Prader-Willi syndrome, who opined the student's needs could not be met in a "typical high school" given his need for total food security.[285] The psychiatrist only had two limited contacts with the student, lacked a "particular, personal knowledge of [him]," and never visited his high school or participated in the IEP meetings.[286] She provided only a generic ultimate opinion concluding the student could not receive an appropriate education "in a *typical high school* with special education modification."[287] Judge Matsch similarly found parents' other witnesses who testified the district could not provide a free and

appropriate public education for the student unpersuasive given the short time they spent with the student, their differing notions of "total food security," and their lack of educational experience.[288]

We are not in the same position. Hearing Officer Skidmore concluded Q.M. requires total food security in a school-wide environment to obtain a meaningful educational benefit.[289] Her reasoned conclusion is supported by the evidence. The District failed to meet its burden to persuade us otherwise. Hearing Officer Skidmore found Q.M.'s endocrinologist, Dr. Jennifer Miller's testimony "cogent and compelling with respect to [Q.M.'s] medical conditions and needs given her extensive qualifications."[290] Dr. Miller, who specialized in Prader-Willi syndrome for over twenty years, testified she has known Q.M. for about ten years and witnessed changes in his behaviors over the years.[291] She provided a specific ultimate opinion: "[Q.M.] is not able to get an adequate, safe and effective education in his current school system."[292] She also testified about the impact Q.M.'s desire for food has on his ability to learn and how the Latham Centers addresses this by "keep[ing] food completely away from the educational setting."[293]

And unlike in *S.H.* and *K.C.*, where parents did not claim the students needed total food security to obtain a meaningful education, Q.M.'s Parents claim and the record supports Q.M. needed more food security than the District offered for the 2021-2022 school year.[294] Hearing Officer Skidmore held and we agree the record establishes the District knew of Q.M.'s increasingly difficult behaviors, lack of progress, and desires for food but lacked the resources and ability to address his severe symptoms for him to progress.[295] Dr. Miller who has particularized knowledge and treats Q.M. and other children with Prader-Will Syndrome compellingly testified residential placement is necessary to provide adequate food security to enable Q.M. to learn.[296] We must accept Hearing Officer Skidmore's credibility determinations. The District failed to show anything in the record justifies a contrary conclusion.

The District also claims Hearing Officer Skidmore failed to consider the least restrictive environment analysis as part of prong one of the *Burlington-Carter* tuition reimbursement analysis.[297] We apply a two-part test for assessing compliance with the least restrictive environment requirement: (1) "whether education in the regular classroom, with the use of supplementary aids and services, can be achieved satisfactorily[;]" and (2) if we find placement outside of a regular classroom is necessary for Q.M.'s educational benefit, we must evaluate "whether the [District] has mainstreamed [Q.M.] to the maximum extent appropriate, i.e., whether the school has made efforts to include [Q.M.] in school programs with nondisabled children whenever possible."[298] The record supports the placement at the Latham Centers complied with the least restrictive environment analysis. Hearing Officer Skidmore acknowledged the District's least restrictive environment obligation and found Q.M. needed "a structured, food secure, residential environment that includes care 24 hours a day, 365 days a year," and "the record preponderantly establishes that [Q.M.'s] presentation as of May 2021 could not be met in the District high school for fall of 2021."[299]

We consider three factors when conducting the least restrictive environment analysis: (1) the steps the District has taken to accommodate Q.M. in a regular classroom; (2) Q.M.'s ability to receive an educational benefit from regular education; and (3) the effect of Q.M.'s presence on the regular classroom.[300] The February 2021 IEP provided Q.M. would participate in the regular education environment for content area classes other than reading, written expression, and math and would spend approximately 65% of the day in the regular classroom.[301] He would also have an aid for food management, but even this safeguard had proven ineffective as Q.M.'s condition worsened because Q.M.'s parents continued to find him with unauthorized food when he returned from school.[302] Dr. Miller swore Q.M. remained distracted in the District school environment by

the thoughts of food and required a food secure place to learn which the District had not provided at this time.[303] Q.M.'s behavioral outbursts also negatively affected the learning environment.[304] Hearing Officer Skidmore's decision Q.M. could no longer receive an educational benefit from the District's high school which the District had offered at the time is supported by the evidence.

The District's February 2021 IEP and the revised May 2021 IEP do not provide for total food security and the District has not met its burden in proving either IEP met Q.M.'s behavioral and academic needs, while providing appropriate transition and vocational experiences. Hearing Officer Skidmore considered all the testimony and made credibility determinations and we also reviewed all the evidence.

We find Hearing Officer Skidmore did not err in finding the District did not offer Q.M. a free and appropriate public education for the 2021-2022 school year.

### (2) The Hearing Officer properly found Latham Centers is an appropriate placement for Q.M. under the second *Burlington-Carter* test.

The District argues Parents are not entitled to tuition reimbursement because Latham Centers is not an appropriate placement under the second test of the *Burlington*-*Carter* analysis even if Hearing Officer Skidmore engaged in the appropriate legal analysis as to prong one.[305] The District again fails to meet its burden.

We may grant tuition reimbursement only if we find the alternative private placement is appropriate.[306] For placement at a residential program to be "appropriate," the program must itself be proper under the IDEA—it must "provide [ ] significant learning and confer[ ] meaningful benefit" and must be "the sort of program that the public school should have taken financial responsibility for in the first place."[307] The District is not responsible "for the placement of students who need twenty-four-hour supervision for medical, social, or emotional reasons, and receive only an incidental educational benefit from that placement."[308]

Hearing Officer Skidmore found Latham Centers appropriate given "its intensive and structured programming that directly addresses Student's medical condition, as well as educational and behavioral needs."[309] She recognized Q.M. has demonstrated growth at Latham Centers.[310] Latham Centers implemented the goals in Q.M.'s recent IEP and Q.M.'s educational program encompasses academic, behavioral, functional living, social, and vocational skills.[311] Unlike in *Munir v. Pottsville Are School Dist.* where our Court of Appeals found no tuition reimbursement when the student enrolled in a private placement to meet his mental health needs and any educational benefits he received were incidental, here Q.M. is attending Latham Centers because he needs a structured 24 hours food secure facility to receive any educational benefit as Hearing Officer Skidmore found and as is supported by the evidence.[312] Similar to *Colonial Sch. Dist. v. E.G.*, where Magistrate Judge Rice found private residential placement appropriate where a student needed a consistent and structured program to address his behavioral issues and obsession with electronics, Hearing Officer Skidmore found Q.M. needed a structured, food secure environment to learn given his food seeking behaviors.[313]

Latham Centers is a "res-ed" program characterized as a residential education program and licensed through the Department of Elementary & Secondary Education in Massachusetts and the Department of Early Education and Care as explained by Latham Centers's Director of Program Marketing and Admissions.[314] Latham Centers is not a licensed mental health facility.[315] We find Hearing Officer Skidmore did not err in finding the Latham Centers an appropriate placement for Q.M.

### (3) The Hearing Officer properly found tuition reduction is appropriate under the third test of the *Burlington-Carter* analysis but did not properly include the entire school year for a year-round program.

Latham Centers billed $280,000 as annual tuition for the 2021-2022 school year.[316] The District argues if we decide tuition reimbursement is still warranted Hearing Officer Skidmore's

decision to equitably reduce the amount of tuition awarded by 15% ($42,000.00) should be upheld, while Parents argue Hearing Officer Skidmore erred in reducing the tuition award.[317] Parents also argue Hearing Officer Skidmore erred in failing to award reimbursement beginning on May 17, 2021 until the beginning of the 2021-2022 school year when Q.M. began to attend Latham Centers which totaled $81,125.08.[318]

We determine whether "the equities weigh in favor of reimbursement" under prong three of the *Burlington-Carter* analysis.[319] We may reduce or deny reimbursement "upon a judicial finding of unreasonableness with respect to actions taken by the parents."[320] We primarily look at the appropriateness of the IEP and the behavior of the Parents in determining a tuition award.[321]

The record establishes Parents were active in Q.M.'s education over the years and participated in good faith in each IEP meeting until Q.M. enrolled at the Latham Centers.[322] Parents also complied with their obligation to give the District ten days' notice before enrolling Q.M. at the Latham Centers.[323] Parents participated in good faith with the IEP team up until they gave the District notice of their intent to enroll Q.M. at the Latham Centers. Although Hearing Officer Skidmore based her decision in part on Parents giving notice to remove Q.M. from the District on May 3, 2021, ten days before the May 13, 2021 IEP meeting, the District had not scheduled the meeting until May 7, 2021 *after* Parents' sent the notice letter.[324] Parents giving the ten day notice should not have not been considered "unreasonable." We do not know how much weight Hearing Officer Skidmore gave to this factor, but it is not the only factor Hearing Officer Skidmore considered. She also considered the "complexities of this case" and how Parents did not freely share their own private understanding of Q.M.'s medical condition they received from Dr. Miller with the District.[325] We uphold Hearing Officer Skidmore's decision to reduce the tuition

reimbursement award by 15% as it is supported by the record and Parents failed to meet their burden to persuade us otherwise.

But Hearing Officer Skidmore erred in failing to award tuition reimbursement beginning on May 17, 2021 when Q.M. began to attend Latham Centers until the beginning of the 2021-2022 school year. Hearing Officer Skidmore awarded tuition reimbursement for 2021-2022 school year, but she recognized "[Q.M.'s *presentation as of May 2021* could not be met in a District high school for the fall of 2021."[326] Both the February 2021 IEP and the revised May 2021 IEP, which Hearing Officer Skidmore found failed to provide Q.M. with a free appropriate public education had implementation dates of March 1, 2021.[327] Officer Skidmore found as of May 2021 the District denied Q.M. a free appropriate public education and Q.M. needed "a structured, food secure residential environment that includes care *24 hours a day, 365 days a year*[.]"[328]

We agree. We correct the error in addressing the full year. We find an award of 85% of tuition reimbursement is warranted beginning on May 17, 2021 through August 2021.

### B.    Genuine disputes of material fact preclude summary judgment on the March 2022 IEP requiring a fact finding.

The parties cross-moved for summary judgment on the Parents' claim for tuition reimbursement for the 2022-2023 school year. Parents ask us to decide whether the District's March 2022 IEP affords Q.M. a free and appropriate public education for the 2022-2023 school year. Parents represent Q.M. continues to make progress at the Latham Centers.[329] Parents represent Q.M. is a "completely different young adult since he started at Latham[.]"[330] Q.M. returned home for ten days at the end of May 2022.[331] During this time, Q.M's mother swears she dedicated "all day everyday to [Q.M.]" and "if we remove the structure, he falls back into the state of anxiety and manipulation."[332]

The District contends given Q.M.'s behavioral progress, the least restrictive environment is to transition him back to the District.[333] The District also moves for summary judgment on Parents' claims seeking reimbursement for the current 2022-2023 school year arguing the March 10, 2022 IEP is appropriate and compensatory damages are not an available remedy.[334] The District argues we should dismiss Parents' counterclaim and enter summary judgment in its favor because the March 2022 IEP is appropriate and offers Q.M. a free appropriate public education in the least restrictive environment.[335] Parents respond arguing the March 2022 IEP is inappropriate and tuition reimbursement is warranted because it contains the same flaws as the February 2021 and May 2021 IEPs including, among other things, it does not provide total food security, it does not provide services for twenty-four hours a day, which Q.M. needs to make progress, and it does not provide goals, benchmarks, or opportunities for teaching activities of daily living.[336]

We find genuine disputes of material fact exist as to whether the District provided Q.M. with a free appropriate public education for the 2022-2023 school year and deny summary judgment. We require fact finding as to the March 2022 IEP.

We are hesitant to supplant expertise of a hearing officer who regularly evaluates educational plans. Congress also recognizes the value of this expertise and the limited role of federal judges. Congress requires parents must exhaust the administrative remedies available under the IDEA before invoking our subject matter jurisdiction.[337] We may generally only excuse a party's failure to exhaust where: "(1) exhaustion would be futile or inadequate; (2) the issue presented is purely a legal question; (3) the administrative agency cannot grant relief; and (4) exhaustion would cause severe or irreparable harm."[338] Although our Court of Appeals has yet to address whether a party appealing administrative decisions must initiate a new administrative proceedings every time a new school year begins or a new IEP is presented, Judge Robreno found

re-exhaustion is unnecessary when a later IEP is "substantially similar" to a previous one.[339] This approach is consistent with other courts.[340] Both the District and Parents agree the March 2022 IEP is substantially similar to the May 2021 IEP for the purposes of administrative exhaustion.[341] We cannot tell today from the record. But we defer to experienced counsels' view the March 2022 IEP is substantially similar to the revised May 2021 IEP and thus re-exhaustion is not necessary.[342] We also afford counsel another opportunity to review this issue and decide whether they prefer the expertise of the hearing officer before we engage in fact finding.

The proposed placement for the March 2022 IEP is Central Bucks High School West with community based instruction, through the use of specialized instruction at Q.M.'s instructional level, close adult supervision, and the use of a positive behavior support plan.[343] Q.M. will be in special education classes for all academics, but can participate with general education peers in physical education, lunch, and additional electives.[344] He will spend approximately 19% of the day in the regular classroom.[345]

The District in the IEP notes: "[Q.M.] cannot be around other students who are eating or preparing food in the classroom. [He] may get frustrated and yell[.]"[346] To address Q.M.'s need for food security, the March 2022 IEP provides: food security by locking cabinets with food and locking refrigerators across all classroom settings; one-on-one paraprofessional support for inclusion, academic differentiation, behavior, transitions, and food management; two scheduled snack times for Q.M with food brought from home; Q.M. would bring food from home during lunches and will not buy anything from the cafeteria; an adult to monitor Q.M. during lunch in a discrete manner to ensure no sharing or trading of food; Parents and District would discuss strategies for managing food in a variety of settings (field trips, extra-curricular activities, etc.) as needed; Parents may attend field trips if desired; and IEP team would be trained by the Prader-

Willi Syndrome Association (USE)'s Wyatt Special Education Advocacy Training on facilitating inclusion and addressing in-school behavioral challenges.[347] The District further provides Q.M. will have lunch in "a designated location that is not the cafeteria."[348]

Genuine disputes of material fact exist as to whether the March 2022 IEP provides Q.M. with a free appropriate public education under prong one of the *Burlington-Carter* analysis even though it is substantially similar to the May 2021 IEP.[349] The March IEP 2022 IEP must be "reasonably calculated to enable [Q.M.] to make progress appropriate in light of the [Q.M.'s] circumstances" to properly provide a free and appropriate public education.[350] Genuine disputes of material fact exist as to whether the IEP is reasonably calculated to enable Q.M. to make progress given his circumstances. These disputes include whether the new IEP provides sufficient food security to enable Q.M. to benefit from the education offered by the District; whether the District through the new IEP addresses Q.M.'s transition, behavior, and food management needs; and whether the least restrictive environment for Q.M. is a regular high school given Q.M. no longer has exhibited certain problematic behaviors at Latham Centers. We are also mindful of Judge Matches' thoughtful analysis setting at least one standard for students living with Prader-Willi syndrome in *Zachary.*

General disputes of material fact also exist as to whether Latham Centers remains a proper placement for Q.M. given his behavioral and academic progress under prong two of the *Burlington-Carter* analysis. The record demonstrates Q.M. has exhibited growth while at Latham Centers and has been able to progress in the food secure environment. The District contends given Q.M.'s behavioral progress, the least restrictive environment is to transition him back to the District.[351] Although Q.M. successfully returned home at the end of May 2022 for ten days, Q.M's

mother swears she dedicated "all day everyday to [Q.M.]" and "if we remove the structure, he falls back into the state of anxiety and manipulation."[352]

And there also exists genuine disputes of material fact as to whether Parents cooperated with the District or acted unreasonably before the District finalized the March 2022 IEP which we must consider when weighing the equities under the third *Burlington-Carter* test. Parents sent the District its signed notice disapproving of the March 2022 IEP on March 31, 2022, and provided *for the first time* Q.M.'s written comprehensive treatment plan for the Latham Centers.[353] The District could not and did not consider this information in its proposal since Parents sent this information to the District after the District already finalized the March 2022 IEP.[354] The District swears Parents have not executed a release of records so it can access Q.M.'s full education records at Latham as of June 30, 2022, and Parents have not allowed the District the ability to speak with Q.M.'s teachers.[355]

We cannot enter judgment as a matter of law because genuine disputes of material fact exist as to whether the District March 2022 IEP is appropriate under the IDEA.

### C.    We find no basis for compensatory damages.

Parents sue the District for compensatory damages under IDEA, Section 504 of the Rehabilitation Act of 1973, and Title II of the Americans with Disabilities Act.[356] Parents seek additional tuition reimbursement, including interest and penalties Parents incurred by withdrawing from savings and investment funds to pay for Q.M.'s tuition at the Latham Centers.[357] The District moves for summary judgment arguing these damages are not an available remedy under IDEA.[358] Parents seem to not dispute compensatory damages are not available under the IDEA but argue compensatory damages are an available remedy under Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act.[359]

We "shall grant such relief as [we] determine[] is appropriate" in ruling on claims brought under the IDEA.[360] Our Court of Appeals has not decided whether "appropriate relief" under the IDEA includes compensatory damages.[361] But other courts of appeals addressed this issue and uniformly held compensatory damages are not recoverable under the IDEA.[362] These courts reason compensatory damages are generally inconsistent with the purpose and statutory scheme of the IDEA.[363] We agree with the overwhelming weight of authority from several courts of appeals and deny Parents' claim for compensatory damages under the IDEA as a matter of law and grant the District's motion for summary judgment.

Compensatory damages are available as remedy under Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act if the Parents demonstrate the District intentionally discriminated against Q.M.[364] A showing of deliberate indifference satisfies this standard.[365] To establish deliberate indifference, Parents "must present evidence that shows both: (1) *knowledge* that a federally protected right is substantially likely to be violated ..., and (2) *failure to act* despite that knowledge."[366] Our Court of Appeals instructs deliberate indifference requires actual knowledge and not merely allegations one "would have" or "should have known."[367]

Parents argue they demonstrated the District acted with deliberate indifference by relying on Hearing Officer Skidmore's conclusion the District "declined to seek to be thoroughly informed of [Q.M.'s] needs in the spring of 2021[,]" and claim this constitutes "knowing indifference."[368] We find no genuine issue of material fact upon reviewing the evidence and construing any disputes in favor of Parents. Parents adduce no evidence the District had (1) actual knowledge that a federally protected right is substantially likely to be violated and (2) failed to act despite that knowledge.

We find Parents present no genuine issue of material fact and the District is entitled to judgment as a matter of law on Parents' claims under Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act.

### D.    We find no present basis for attorneys' fees under IDEA or expert fees.

Parents argue they are entitled to attorneys' fees and costs under IDEA and expert costs under Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act.[369] They argue they are the prevailing parties on the 2021-2022 school year entitled to fees and costs. But we cannot grant their relief as they did not adduce evidence to support a finding of either attorneys' fees under IDEA or for reimbursement of expert fees under the Rehabilitation Act and Americans with Disabilities Act. We grant them leave to petition for these attorneys' and expert fees either now or after resolving the issues on the present school year.[370]

Congress in the IDEA provides we, "in [our] discretion, may award reasonable attorneys' fees as part of the costs" "to a prevailing party who is the parent of a child with a disability[.]"[371] To "prevail" under the IDEA, Parents must obtain a "material alteration of the legal relationship of the parties" that is "judicially sanctioned."[372] A party achieves a "material alteration" of the parties' legal relationship and "prevail[s]" for attorneys' fees purposes only if he obtains relief that is "in some way merit[s]-based."[373] Prevailing parties cannot recover the costs of experts or consultants under the IDEA.[374] The Parents offer no evidence in support of their reasonable attorneys' fees incurred in prevailing for the 2021-2022 school year. We deny the Parents' motion for reasonable attorneys' fees (as supported by comparator reasonableness evidence) and costs under IDEA without prejudice.

We may also award expert fees under the Rehabilitation Act and the Americans with Disabilities Act.[375] Parents did not adduce evidence on expert fees but simply state in a conclusory

fashion "[a]s the prevailing party, Parents are entitled to expert costs under Section 504 and the ADA."[376] We cannot rule on this claim based on the current record. We deny Parents' request for expert fees without prejudice given the parties did not fully brief this issue given our rulings on the parties' cross-motions for judgment on the administrative record and motions for summary judgment on Parents' counterclaim. We grant them leave to file a fee petition or otherwise present evidence at trial for us to consider.

### III.   Conclusion

Parents have not shown a basis to disturb Hearing Officer Skidmore's detailed findings for the 2019-2020 and 2020-2021 school years. The District failed to show a basis to disturb  Hearing Officer Skidmore's detailed findings for the 2021-2022 school year based on an extensive administrative record and after evaluating the credibility of several witnesses. Parents' and the District's disagreement with the Hearing Officer's conclusions when based on detailed reasons grounded in her evaluation of witness credibility is not enough under the Law.

Parents present no genuine issue of material fact and the District is entitled to judgment as a matter of law on Parents' claims for compensatory damages under Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act. We find a disputed genuine issue of material fact as to the 2022-2023 school year and must deny summary judgment for the District. We find genuine disputes of material fact as to whether the District provided Q.M. with a free appropriate public education for this upcoming year. We will hear the evidence relating to the 2022-2023 school year during our upcoming non-jury trial or, if the parties timely elect, we will remand to the Hearing Officer's expertise for findings.

---

[1] Our Policies require a Statement of Undisputed Facts ("SUMF") and appendix in support of summary judgment. The parties submitted the supplemented administrative record as the Joint

Appendix (ECF Doc. Nos. 24-3, 23-4). References to the Joint Appendix ("J.A.") shall be by Bates number, for example, "J.A. 1." The District filed its SUMF at ECF Doc. No. 24-2 ("District SUMF"). Parents responded at ECF Doc. No. 30-1 ("Parents' Response to SUMF"). Parents submitted their SUMF at ECF Doc. No. 25-1 ("Parents' SUMF"). District responded at ECF Doc. No. 29-1 ("District Response to SUMF"). The parties filed the full administrative record at ECF Doc. No. 10.

[2] District SUMF ¶ 1; J.A. 674 at ¶ 2.

[3] ECF Doc. No. 10-10 at 1, 6; ECF Doc. No. 10-11 at 625–27; J.A. 583.

[4] District SUMF ¶ 2.

[5] *Id.*

[6] *Prader-Willi syndrome*, NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/genetics/condition/prader-willi-syndrome/ (last visited Sept. 2, 2022).

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] ECF Doc. No 10-7 at 113.

[13] *Id.* at 128.

[14] *Prader-Willi syndrome*, NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS.

[15] *Id.* Q.M. is on medication to control his skin picking. *See* ECF Doc. No. 10-8 at 172.

[16] District SUMF ¶ 3; ECF Doc. No. 10-7 at 118.

[17] *Is there a cure for Prader-Willi syndrome (PWS)?* NATIONAL INSTITUTE OF CHILD HEALTH AND HUMAN DEVELOPMENT, https://www.nichd.nih.gov/health/topics/prader-willi/conditioninfo/cure (last visited Sept. 2, 2022).

[18] *What are the treatments for Prader-Willi syndrome (PWS)?* NATIONAL INSTITUTE OF CHILD HEALTH AND HUMAN DEVELOPMENT, https://www.nichd.nih.gov/health/topics/prader-willi/conditioninfo/treatments (last visited Sept. 2, 2022). Q.M.'s endocrinologist started treating him with growth hormones as an infant. *See* ECF Doc. No. 10-7 at 122.

[19] *What are the treatments for Prader-Willi syndrome (PWS)?* NATIONAL INSTITUTE OF CHILD HEALTH AND HUMAN DEVELOPMENT.

[20] Parents SUMF ¶ 52.

[21] ECF Doc. No. 10-8 at 160–70, 207–08.

[22] *Id.* at 160–61.

[23] *Id.*

[24] *Id.* at 161–62.

[25] District SUMF ¶ 6; ECF Doc. No. 10-10 at 9.

[26] Parents SUMF ¶ 9; ECF Doc. No. 10-10 at 9.

[27] District SUMF ¶ 14.

[28] *Id.* ¶ 7.

[29] *Id.* ¶ 17; ECF Doc. No. 10-10 at 33–97.

[30] ECF Doc. No. 10-10 at 33–97.

[31] *Id.* at 85.

[32] District SUMF ¶¶ 17–18.

[33] ECF Doc. No. 10-10 at 79–80.

[34] District SUMF ¶ 18; ECF Doc. No. 10-10 at 96.

[35] ECF Doc. No. 10-10 at 87.

[36] *Id.* at 48.

[37] *Id.* at 202.

[38] District SUMF ¶ 20; ECF Doc. No. 10-10 at 1. Parents and the District disagree on whether the middle school staff provided a food-secure environment for Q.M. District SUMF ¶ 9; Parents Response to SUMF ¶ 9.

[39] District SUMF ¶ 21–22.

[40] Parents SUMF ¶ 23; ECF Doc. No. 10-10 at 120–196.

[41] ECF Doc. No. 10-10 at 197–198. Parents contend it is impossible to know whether Q.M. made progress on his behavioral goals because the District provided a limited amount of behavioral data. Parents Response to SUMF ¶ 24.

[42] Parents SUMF ¶ 24.

---

[43] District SUMF ¶ 27.

[44] *Id*. ¶ 28; ECF Doc. No 10-10 at 293–371.

[45] ECF Doc. No 10-10 at 293–371; District SUMF ¶ 30.

[46] ECF Doc. No. 10-10 at 369.

[47] District SUMF ¶ 30; ECF Doc. No. 10-10 at 347–48.

[48] District SUMF ¶¶ 31, 34.

[49] *Id*. ¶ 32; ECF Doc. No. 10-10 at 355.

[50] ECF Doc. No. 10-10 at 317.

[51] ECF Doc. No. 10-6 at 116.

[52] ECF Doc. No. 10-10 at 357.

[53] District SUMF ¶ 32; ECF Doc. No. 10-10 at 370.

[54] ECF Doc. No. 10-10 at 348–49.

[55] District SUMF ¶ 33; ECF Doc. No. 10-10 at 202.

[56] ECF Doc. No. 10-3 at 10.

[57] Parents SUMF ¶ 57.

[58] Response to Parents SUMF ¶ 57; District SUMF ¶ 37.

[59] ECF Doc. No. 10-10 at 662–63.

[60] District SUMF ¶ 35; ECF Doc. No. 10-10 at 453.

[61] District SUMF ¶ 36; ECF Doc. No. 10-10 at 595–596.

[62] District SUMF ¶ 37; ECF Doc. No. 10-10 at 588–658.

[63] District SUMF ¶ 37.

[64] ECF Doc. No. 10-10 at 595.

[65] ECF Doc. No. 10-8 at 317–18.

[66] ECF Doc. No. 10-10 at 596.

[67] District SUMF ¶ 40; ECF Doc. No. 10-10 at 595.

[68] District SUMF ¶ 38.

[69] ECF Doc. No. 10-10 at 648.

[70] Parents Response to SUMF ¶ 39.

[71] District SUMF ¶ 42; ECF Doc. No. 10-10 at 750–872.

[72] District SUMF ¶ 44.

[73] District SUMF ¶¶ 45–46.

[74] ECF Doc. No. 10-10 at 822.

[75] *Id*. at 807–09.

[76] *Id*. at 767.

[77] *Id*. at 768.

[78] *Id*. at 777.

[79] *Id*. at 777.

[80] District SUMF ¶ 47.

[81] *Id*. ¶ 48; ECF Doc. No. 10-10 at 873–79.

[82] District SUMF ¶ 49; ECF Doc. No. 10-10 at 873–79.

[83] District SUMF ¶¶ 51–52; ECF Doc. No. 10-10 at 880–944.

[84] District SUMF ¶ 52; ECF Doc. No. 10-10 at 903–905.

[85] District SUMF ¶ 53; ECF Doc. No. 10-10 at 906–19.

[86] District SUMF ¶ 53; ECF Doc. No. 10-10 at 906–19.

[87] District SUMF ¶ 59; ECF Doc. No. 10-10 at 934–39.

[88] ECF Doc. No. 10-10 at 945–46.

[89] District SUMF ¶ 77.

[90] *Id*.

[91] ECF Doc. No. 10-10 at 955.

[92] *Id*.

---

[93] *Id*. at 1043.

[94] *Id*.

[95] *Id*. at 1044.

[96] *Id*. at 956.

[97] *Id*. at 969.

[98] *Id*. at 1030.

[99] Parents SUMF ¶ 5.

[100] *Id*. ¶ 6; District Response to SUMF ¶ 6.

[101] Parents SUMF ¶ 83; Parents Response to SUMF ¶ 79.

[102] Parents SUMF ¶ 83.

[103] District SUMF ¶ 72; ECF Doc. No. 10-11 at 625–27.

[104] District SUMF ¶ 72; ECF Doc. No. 10-11 at 625–27.

[105] ECF Doc. No. 10-12.

[106] *Id*.

[107] Parents SUMF ¶ 84.

[108] Parents Response to SUMF ¶ 79.

[109] J.A. 606–09.

[110] *Id*. at 609.

[111] *Id*. at 606.

[112] *Id*. at 605; 313–14 (general event report for 1/26/22 food related security breach for an empty plastic cracker bag and food container); 478–79 (general event report for 12/28/21 food related security breach for a candy wrapper in Q.M.'s room).

[113] *Id*. at 313–14 (general event report for 1/26/22 food related security breach for plastic cracker bag and food container); 325–26 (general event report for 3/10/22 food related security breach for package of oyster crackers); 338–39 (general event report for 4/18/22 food related security breach for four mints); 341–42 (general event report for 5/16/22 food related security breach for Chex Mix); 384–85 (general event report for 6/14/22 food related security breach for five crackers); 396–97 (general event report for 7/02/21 food related security breach for chewing gum); 453–54

(general event report for 9/15/21 food related security breach for Aleve brand liquid gels); 478–79 (general event report for 12/28/21 food related security breach for a candy wrapper).

[114] Parents SUMF ¶ 83.

[115] J.A. 620–22.

[116] *Id*. at 631–32.

[117] *Id*. at 642–43.

[118] Parents SUMF ¶¶ 67–69.

[119] District Response to SUMF ¶¶ 67–70.

[120] ECF Doc. Nos. 10-6, 10-7, 10-8, 10-9.

[121] ECF Doc. No. 10-7 at 115, 119–22. Dr. Miller has seen Q.M. in person since 2011, except for 2021 where she conducted their annual visit via telemedicine due to the COVID-19 pandemic. *Id*.

[122] *Id*. at 115, 119–22.

[123] *Id*. at 125.

[124] *Id*. at 133, 137.

[125] *Id*. at 126.

[126] *Id*. at 132–33.

[127] ECF Doc. No. 10-7 at 129. Dr. Miller testified there is no cafeteria in the educational setting and no food in the classrooms at Latham Centers. *Id*.

[128] ECF Doc. No. 10-8 at 35, 40–43; ECF Doc. No. 10-11 at 450–612.

[129] ECF Doc. No. 10-8 at 29–34, 44–45; ECF Doc. No. 10-11 at 450–612.

[130] ECF Doc. No. 10-8 at 45.

[131] *Id*. at 49–51.

[132] *Id*. at 51.

[133] Id. at 157–66.

[134] *Id*. at 157–66.

[135] *Id*. at 160.

[136] *Id.* at 160–61.

[137] *Id.* at 162–64.

[138] *Id.* at 230.

[139] ECF Doc. No. 10-7 at 8.

[140] *Id.* at 10. Of the forty-four students, thirty are placed through their local school districts. *See Id.* at 12.

[141] *Id.* at 14.

[142] *Id.* at 20.

[143] *Id.* at 41.

[144] *Id.* at 41, 52, 55.

[145] *Id.* at 100.

[146] *Id.* at 60.

[147] ECF Doc. No 10-6 at 9, 11.

[148] *Id.* at 90–91, 104.

[149] *Id.* at 179.

[150] *Id.* at 180–83.

[151] *Id.* at 212, 219.

[152] *Id.* at 212, 219, 222.

[153] *Id.* at 219–23, 262–63.

[154] *Id.* at 224–25.

[155] *Id.* at 227–28.

[156] *Id.* at 225, 268.

[157] *Id.* at 225.

[158] ECF Doc. No. 10-3 at 23.

[159] *Id.*

---

[160] *Id.* Hearing Officer Skidmore also reasoned her decision must be based on the record as a whole, and not on a single witness's focus on specific information. *Id.*

[161] *Id.*

[162] *Id.* at 27.

[163] *Id.* at 3.

[164] *Id.*

[165] *Id.* at 4, 21–22.

[166] *Id.* at. 4, 27.

[167] *Id.* at 5, 25–26.

[168] *Id.* at 7.

[169] *Id.* at 7–8.

[170] *Id.* at 8.

[171] *Id.* at 8, 153.

[172] *Id.*

[173] *Id.* at 8, 160–176.

[174] *Id.* at 10, 178.

[175] *Id.* at 520.

[176] *Id.* at 556.

[177] *Id.* at 558.

[178] *Id.* at 556.

[179] *Id.* at 548–50.

[180] *Id.* at 10, 178, 191–92. The Parents claim the March 2022 IEP contains the same flaws as the earlier IEP including, among other things, it does not provide total food security, it does not provide services for 24 hours a day, which Q.M. needs to make progress, and it does not provide goals, benchmarks, or opportunities for teaching activities of daily living. Parents SUMF ¶ 64. The District contends the alleged "flaws" Parents reference are in the draft version of the IEP, which the District maintains is significantly different than the finalized IEP. *See* District Response to SUMF ¶ 64.

[181] J.A. 10.

[182] *Id*. at 11.

[183] ECF Doc. No. 1.

[184] ECF Doc. No. 7.

[185] *Id*.

[186] *See* ECF Doc. No. 24-1.

[187] ECF Doc. No. 30.

[188] J.A. 652.

[189] *Id*. at 653.

[190] *See* ECF Doc. No. 25-2.

[191] *See* ECF Doc. No. 29. If we decide tuition reimbursement is still warranted for the 2021-2022 school year, the District argues the Hearing Officer's decision to equitably reduce the amount of tuition awarded should be upheld. *See* ECF Doc. No. 29 at 9–11.

[192] *S.H. v. State-Operated Sch. Dist. of City of Newark*, 336 F.3d 260, 269–70 (3d Cir. 2003); *Carlisle Area Sch. v. Scott P. By & Through Bess P.*, 62 F.3d 520, 524 (3d Cir. 1995), *amended* (Oct. 24, 1995) (holding we may reach an independent decision, except we must "accord the decision of the state agency 'due weight' in [our] consideration."). Our summary judgment ruling on an IDEA claim is effectively a ruling on the administrative record. *K.E. v. N. Highlands Reg'l Bd. of Educ.*, 840 F. App'x 705, 709 (3d Cir. 2020).

[193] *S.H.*, 336 F.3d at 270.

[194] *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010).

[195] *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 243 (3d Cir. 2012).

[196] *S.H.*, 336 F.3d at 270.

[197] *Id*. (*quoting Oberti by Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist*., 995 F.2d 1204, 1220 (3d Cir. 1993)).

[198] *In re Educ. Assignment of Joseph R*., 318 F. App'x 113, 118 (3d Cir. 2009) ("[T]he district court owes no deference to conclusions of law drawn by a state or local educational agency.").

[199] *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 270 (3d Cir. 2012) (footnote omitted).

[200] *Sch. Dist. of Philadelphia v. Post*, No. 15-4501, 2017 WL 2879684, at *5 (E.D. Pa. July 5, 2017) (citing 20 U.S.C. § 1415(i)(2)(C)(iii)).

[201] *See* ECF Doc. No. 10; ECF Doc. No. 24-3, 24-4.

[202] Under the Individuals with Disabilities Education Improvement Act, "[any] party aggrieved by the findings and decision" of the state administrative hearing officer may bring suit in "any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy." 20 U.S.C. § 1415(i)(2)(A). When reviewing the complaint, we "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C).

[203] *D.K.*, 696 F.3d at 244 (quoting *P.P. ex rel. Michael P. v. West Chester Area Sch. Dist.*, 585 F.3d 727, 735 (3d Cir. 2009)).

[204] 20 U.S.C. § 1412(a)(1); *see also D.S.*, 602 F.3d at 556.

[205] *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 994 (2017). "Special education" is "specially designed instruction . . . to meet the unique needs of a child with a disability"; "related services" are the support services "required to assist a child . . . to benefit from" that instruction. *Id.* (citing 20 U.S.C. §§ 1401(26), (29)).

[206] *Lauren G. ex rel. Scott G. v. West Chester Area Sch. Dist.*, 906 F. Supp. 2d 375, 388 (E.D. Pa. 2012) ("The Third Circuit has 'held that there are few differences, if any, between IDEA's affirmative duty and § 504's negative prohibition and have noted that the regulations implementing § 504 require that the school districts provide a free and appropriate public education to each qualified handicapped person in its jurisdiction.'" (quoting *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.,* 172 F.3d 238, 253 (3d Cir.1999)). Congress, through the Americans with Disabilities Act, provides "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. We interpret both statutes "to prevent students with disabilities from being denied a free appropriate public education by a school district." *Taylor v. Altoona Area Sch. Dist.*, 737 F. Supp. 2d 474, 486–87 (W.D. Pa. 2010) (internal quotation omitted).

[207] *Endrew F. ex rel. Joseph F.*, 137 S. Ct. at 994 (internal citation omitted).

[208] *Id.* (internal citations omitted).

[209] *D.S.*, 602 F.3d at 557.

[210] *Endrew F. ex rel. Joseph F.,* 137 S. Ct. at 996.

[211] *Ridley Sch. Dist.*, 680 F.3d at 269 (citing *D.S.*, 602 F.3d at 556).

[212] *Oberti by Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist.*, 995 F.2d 1204, 1213 (3d Cir. 1993) (quoting 20 U.S.C. § 1412(5)(B)).

[213] *T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 579 (3d Cir. 2000).

[214] *D.S.*, 602 F.3d at 557.

[215] *See S.C. by K.G. v. Lincoln Cnty. Sch. Dist.*, 16 F.4th 587, 594 (9th Cir. 2021) (reversing and remanding with instructions to enter an order to enforce administrative law judge's order requiring student's placement at Latham Centers at district's expense "until the [School] District provides [total food security] in school-wide setting along with an IEP which addresses all of the inadequacies identified in this order"); *K.D. by & through Carrera v. Los Angeles Unified Sch. Dist.*, 816 F. App'x 222, 223 (9th Cir. 2020) (affirming dismissal of student with Prader-Willi syndrome's IDEA claim for failure to exhaust); *Schiff v. D.C.,* No. 18-1382, 2019 WL 5683903, at *6 (D.D.C. Nov. 1, 2019) (holding hearing officer erred as a matter of law in finding district did not need to provide a free appropriate public education to student with Prader-Willi syndrome after his expulsion); *S.H. v. Rutherford Cnty. Sch.*, 334 F. Supp. 3d 868, 875 (M.D. Tenn. 2018) (finding district failed to provide student with Prader-Willi Syndrome a free appropriate education but district could provide a free appropriate education by providing teachers with formal training on Prader-Willi syndrome and implementing a mutually agreeable IEP); *Zachary v. Sch. Dist. No. 1 for the City & Cnty. of Denver*, No. 15-02399, 2016 WL 5815283, at *16 (D. Colo. Oct. 5, 2016) (holding parents failed to prove by a preponderance of the evidence district violated IDEA by failing to develop an IEP reasonably calculated to provide their son with Prader-Willi syndrome a meaningful educational benefit); *T.W. v. Spencerport Cent. Sch. Dist.*, 891 F. Supp. 2d 438, 443 (W.D.N.Y. 2012) (dismissing student with Prader-Willi syndrome IDEA claim for failure to exhaust); *K.C. ex rel. Her Parents v. Nazareth Area Sch. Dist.*, 806 F. Supp. 2d 806, 815 (E.D. Pa. 2011) (finding parents failed to show district denied student with Prader-Willi syndrome a free appropriate public education because IEP included necessary transition services); *Aileen Y. v. Dep't of Educ., Hawaii*, No. 10-00454, 2011 WL 3861411, at *1 (D. Haw. Aug. 4, 2011), *report and recommendation adopted sub nom. Aileen Y. v. Dep't of Educ.*, No. 10-00454, 2011 WL 3861427 (D. Haw. Aug. 31, 2011) (denying student with Prader-Willi syndrome's application for attorneys' fees under IDEA); *J.S. ex rel. D.S. v. Lenape Reg'l High Sch. Dist. Bd. of Educ.*, 102 F. Supp. 2d 540, 540–41 (D.N.J. 2000) (denying parents' of a student with Prader-Willi syndrome application for attorneys' fees under IDEA because district's transfer of student from one school to another within the same district did not constitutes a "change in educational placement").

[216] 806 F. Supp. 2d at 833.

[217] *Id.* at 812.

[218] *Id.* at 812–15.

[219] 334 F. Supp. 3d at 871.

[220] *Id.* at 872.

[221] *Id.* at 875.

[222] 2016 WL 5815283, at *9–10.

[223] *Id.*

[224] *Id.* at *1.

[225] *Id.*

[226] *Id.* at *2.

[227] *Id.* at *3.

[228] *Id.* at *7–9.

[229] *Id.* at *7.

[230] *Id.* at *14.

[231] *Id.* at *10–13.

[232] *Id.* at *16.

[233] *D.K.*, 696 F.3d at 243.

[234] *Endrew F. ex rel. Joseph F.*, 137 S. Ct. at 999 (internal quotation omitted); *see also D.S*, 602 F.3d at 565.

[235] *D.S.*, 602 F.3d at 565 (internal citation omitted).

[236] ECF Doc. No. 10-10 at 203–292, 293–371, 372–440.

[237] *Id*. at 203–92.

[238] *Id*. at 293–371.

[239] *Id*. at 293–371.

[240] *Id*. at 299.

[241] *Id*.

[242] ECF Doc. No. 25-2 at 7.

[243] ECF Doc. No 10-10 at 310, 315–317.

[244] *Id*. at 293–317.

[245] *Id*. at 317–18.

[246] *Id*. at 443–44.

[247] *Id*. at 446–658, 665–749.

---

[248] *Id*. at 736.

[249] *Id*. at 728.

[250] ECF Doc. No. 10-3 at 27–28.

[251] *Id*. at 28. Hearing Officer Skidmore points to the July 2021 neuropsychological evaluation which explains Q.M.'s unique presentation. *See* ECF Doc. No. 10-11 at 628–42.

[252] *Id*. at 29–31.

[253] *D.K.*, 696 F.3d at 243.

[254] *D.S.*, 602 F.3d at 565,

[255] 20 U.S.C. § 1412(a)(10)(C)(iii).

[256] *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 370 (1985); *Florence Cnty. Sch. Dist. Four v. Carter By & Through Carter*, 510 U.S. 7, 15 (1993).

[257] *R.B. v. Downingtown Area Sch. Dist.*, 509 F. Supp. 3d 339, 352 (E.D. Pa. 2020) (*citing Carter*, 510 U.S. at 12–16; *Burlington*, 471 U.S. at 374. The *Burlington-Carter* test is named after two Supreme Court cases which together provide us with the three-step analysis to evaluate tuition reimbursement claims. *See Burlington*, 471 U.S. at 370; *Carter*, 510 U.S. at 15. In *Burlington*, the Supreme Court held Congress's grant of equitable authority in the IDEA empowers us "to order school authorities to reimburse parents for their expenditures on private special education for a child if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act." *Burlington*, 471 U.S. at 360. In *Carter*, the Supreme Court held if we find the District violated the IDEA we must then consider all relevant factors to determine whether private placement is appropriate and whether the equities weigh in favor of reimbursement. *Carter*, 510 U.S. at 15–16.

[258] *Endrew F. ex rel. Joseph F.*, 137 S. Ct. at 1002.

[259] ECF Doc. No. 10-3 at 29.

[260] *Id*.

[261] *Id*. at 29–30.

[262] *H.L. v. Downingtown Area Sch. Dist.*, 624 F. App'x 64, 68 (3d Cir. 2015) (internal citation omitted). Although Hearing Officer Skidmore does not review the 2021-2022 IEPs in detail in her analysis of whether the District provided a free and appropriate public education for the 2021-2022 school year, she provides extensive findings of facts regarding both the February 2021 IEP and May 2021 IEP.

[263] *See* ECF Doc. No. 30 at 10–11.

[264] ECF Doc. No. 10-10 at 820.

[265] *Id*. at 767–68.

[266] *Id*. at 768.

[267] *Id*. at 777.

[268] *Id*. at 833.

[269] *Id*. at 947–1056.

[270] *Id*. at 955.

[271] *Id*.

[272] *Id*. at 1043.

[273] *Id*. at 1043–45.

[274] *Id*. at 956.

[275] *Id*. at 1030–32.

[276] *Endrew F. ex rel. Joseph F.*, 137 S. Ct. at 1002.

[277] Parents SUMF ¶ 9; ECF Doc. No. 10-10 at 956.

[278] ECF Doc. No. 10-8 at 162–64, 230.

[279] District SUMF ¶ 37.

[280] ECF Doc. No. 10-10 at 820; ECF Doc. No. 10-7 at 117–20.

[281] *Zachary*, 2016 WL 5815283, at *15.

[282] *Id.* at *14.

[283] *Id.* at *7–9.

[284] *Id.*

[285] *Id.* at *10.

[286] *Id.* at *10–11.

[287] *Id.*

[288] *Id.* at *10–13.

[289] ECF Doc. No. 10-3 at 29–30.

[290] *Id*. at 23.

[291] ECF Doc. No. 10-7 at 112, 120–21, 124.

[292] *Id*. at 126.

[293] *Id*. at 128–29.

[294] *S.H.*, 334 F. Supp. at 875; *K.C.*, 806 F. Supp. at 833.

[295] ECF Doc. No. 10-3 at 30. Parents argue Dr. Miller's letter is inappropriate because it constitutes hindsight evidence under *Fuhrmann* because the District had no knowledge of Dr. Miller's opinions in the letter prior to implementing the IEP. ECF Doc. No, 24-1 at 9. In *Fuhrmann*, our Court of Appeals held "the measure and adequacy of an IEP can only be determined as of the time it is offered to the student, and not at some later date." *See Fuhrmann on Behalf of Fuhrmann v. E. Hanover Bd. of Educ.*, 993 F.2d 1031, 1040 (3d Cir. 1993). The letter is not hindsight evidence as Dr. Miller explains Q.M.'s *past* behaviors which the District presumably knew about. The record supports the District knew of Q.M.'s increasingly difficult behaviors, which progressively worsened up until ninth grade. ECF Doc. No. 10-8 at 168–70 (Q.M.'s father testifying about Q.M.'s worsening behavior); 237–239 (Q.M.'s mother testifying about Q.M.'s worsening behavior).

[296] ECF Doc. No. 10-7 at 132–33.

[297] *See* ECF Doc. No. 24-1 at 11–13; ECF Doc. No. 31 at 1–2.

[298] *T.R.*, 205 F.3d at 579 (internal citations omitted).

[299] ECF Doc. No. 10-3 at 29.

[300] *T.R.*, 205 F.3d at 579.

[301] District SUMF ¶¶ 44–46; ECF Doc. No. 10-10 at 822. The revised May 2021 IEP provided for direct instruction in the special education classroom for reading, writing, math, social skills, self-regulation skills, employability skills (employability course), science, and social studies and instruction in the general classroom for physical education/health, one elective, homeroom, lunch, and community-based instruction. Q.M. would spend approximately 33% percent of his day in the regular classroom. *See* ECF Doc. No. 10-10 at 1043–44.

[302] ECF Doc. No. 10-8 at 160.

[303] ECF Doc. No. 10-7 at 128–129.

[304] ECF Doc. No. 10-8 at 317–18.

[305] ECF Doc. No. 24-1 at 12–19.

[306] *Munir v. Pottsville Area Sch. Dist.*, 723 F.3d 423, 426 (3d Cir. 2013).

[307] *Id.* at 430 (internal citation omitted).

[308] *Id.* at 432.

[309] ECF Doc. No. 10-3 at 30.

[310] *Id.*

[311] *Id.*

[312] *Munir*, 723 F.3d at 433; ECF Doc. No. 10-3 at 30.

[313] *Colonial Sch. Dist. v. E.G. by & through M.G.*, No. 19-1173, 2020 WL 529906, at *7 (E.D. Pa. Jan. 31, 2020).

[314] ECF Doc. No. 10-7 at 14.

[315] *Id.*

[316] Parents SUMF ¶ 95.

[317] ECF Doc. No. 24-1 at 21–23; ECF Doc. No. 25-2 at 14–18; ECF Doc. No. 29 at 9; ECF Doc. No. 35 at 7–8.

[318] ECF Doc. No. 25-2 at 18; Parents SUMF ¶ 95.

[319] *R.B.*, 509 F. Supp. 3d at 352 (citing *Carter*, 510 U.S. at 12–16; *Burlington*, 471 U.S. at 374).

[320] 20 U.S.C. § 1412(a)(10)(C)(iii)(III).

[321] *Council Rock Sch. Dist. v. M.W. ex rel. Marc W.*, No. 11-4824, 2012 WL 3055686, at *12 (E.D. Pa. July 26, 2012).

[322] ECF Doc. No. 10-8 at 226, 228.

[323] *See* 20 U.S.C. § 1412(a)(10)(C)(iii)(I)(bb); *see also* ECF Doc. No. 10-10 at 945–46.

[324] J.A. 677.

[325] ECF Doc. No. 10-3 at 31.

[326] *Id.* at 29 (emphasis added).

[327] ECF Doc. No. 10-10 at 750, 947.

[328] ECF Doc. No. 10-3 at 29 (emphasis added).

[329] Parents SUMF ¶ 67.

[330] J.A. 678.

[331] *Id.*

[332] *Id.*

[333] *Id.* at 11–12. This argument citing behavior progress over the last year seemingly contradicts the District's other arguments Q.M. behaviorally regressed while at Latham Centers. *See* District Response to SUMF ¶¶ 67–70.

[334] *See* ECF Doc. No. 24-1.

[335] ECF Doc. No. 24-1 at 19–23.

Summary judgment is proper when "the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those 'that could affect the outcome' of the proceeding, and 'a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party.'" *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011)). "Summary judgment is appropriate only if, after drawing all reasonable inferences in favor of the non-moving party, there exists 'no genuine dispute as to any material fact' and the movant 'is entitled to judgment as a matter of law.'" *Moyer v. Patenaude & Felix, A.P.C.*, 991 F.3d 466, 469 (3d Cir. 2021) (quoting *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 770 (3d Cir. 2018)). We do not weigh evidence or make credibility determinations. *Peroza-Benitez v. Smith*, 994 F.3d 157, 164 (3d Cir. 2021) (quoting *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019)).

"The party seeking summary judgment 'has the burden of demonstrating that the evidentiary record presents no genuine issue of material fact.'" *Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016) (quoting *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015)). If the movant carries its burden, "the nonmoving party must identify facts in the record that would enable them to make a sufficient showing on essential elements of their case for which they have the burden of proof." *Willis*, 808 F.3d at 643 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "If, after adequate time for discovery, the nonmoving party has not met its burden, pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against the nonmoving party." *Id.* (citing *Celotex*, 477 U.S. at 322–23).

"This standard does not change when the issue is presented in the context of cross-motions for summary judgment." *Auto–Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (quoting *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987)). "When both parties move for summary judgment, '[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.'" *Auto–Owners Ins. Co.*, 835 F.3d at 402 (quoting 10A Charles Alan Wright et al., FEDERAL PRACTICE & PROCEDURE § 2720 (3d ed. 2016)).

[336] ECF Doc. No. 30 at 20–22.

[337] *Batchelor v. Rose Tree Media Sch. Dist.*, 759 F.3d 266, 272 (3d Cir. 2014).

[338] *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 275 (3d Cir. 2014)

[339] *J.N. ex rel. J.N. v. Penn-Delco Sch. Dist.*, 57 F. Supp. 3d 475, 479–80 (E.D. Pa. 2014).

[340] *See Gill v. Columbi*a*, 93 Sch. Dist.,* 217 F.3d 1027, 1038 n.6 (8th Cir. 2000) ("While IDEA plaintiffs are ordinarily required to exhaust administrative remedies before seeking judicial review . . . plans substantially similar to the IEP under review may also be considered."); *see also D.M. v. Seattle Sch. Dist.*, 170 F. Supp. 3d 1328, 1338 (W.D. Wash. 2016) ("Courts considering evidence of substantially similar, but unexhausted IEPs routinely exercise their discretion to find exhaustion not required.") (citing *DeVries v. Spillane*, 853 F.2d 264, 266–67 (4th Cir.1988); *Pinto v. District of Columbia*, 938 F.Supp.2d 25, 32 (D.D.C. 2013); *Johnson v. Lancaster–Lebanon Intermediate Unit 13*, 757 F. Supp. 606, 614 n.6 (E.D. Pa. 1991)).

[341] ECF Doc. No. 7 at 19–20; ECF Doc. No. 24-1 at 19.

[342] *See J.N. ex rel. J.N.*, 57 F. Supp. 3d at 481.

[343] J.A. 556.

[344] *Id.*

[345] *Id.* at 558.

[346] *Id.* at 556.

[347] *Id.* at 548–50.

[348] *Id.* at 653.

[349] *R.B.*, 509 F. Supp. 3d at 352 (*citing Carter*, 510 U.S. at 12–16; *Burlington*, 471 U.S. at 374).

[350] *Endrew F. ex rel. Joseph F*, 137 S. Ct. at 1002.

[351] J.A. 11–12. This argument of progress seemingly contradicts the District's other arguments Q.M. behaviorally regressed while at Latham Centers. *See* District Response to SUMF ¶¶ 67–70.

[352] J.A. 678.

[353] *Id.* at 9–11, 178, 191–92.

[354] *Id.* at 10.

[355] *Id.* at 11.

[356] ECF Doc. No. 7.

[357] *Id.* at 23.

[358] ECF Doc. No. 24-1 at 23–24.

[359] ECF Doc. No. 30 at 22.

[360] 20 U.S.C. § 1415(i)(2)(C)(iii).

[361] *Neena S. ex rel. Robert S. v. Sch. Dist. of Philadelphia*, No. 05-5404, 2008 WL 5273546, at *14 (E.D. Pa. Dec. 19, 2008).

[362] *Id.* (citing *Nieves–Marquez v. Puerto Rico*, 353 F.3d 108, 125 (1st Cir. 2003); *Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist.,* 288 F.3d 478, 483–86 (2d Cir. 2002); *Sellers v. Sch. Bd. of Manassas,* 141 F.3d 524, 526–28 (4th Cir. 1998); *Marvin H. v. Austin Indep. Sch. Dist.,* 714 F.2d 1348, 1356–57 (5th Cir. 1983); *Crocker v. Tenn. Secondary Sch. Athletic Ass'n,* 980 F.2d 382, 386–87 (6th Cir. 1992); *Charlie F. v. Bd. of Educ. of Skokie Sch. Dist.,* 98 F.3d 989, 991 (7th Cir. 1996), *abrogated in part on another ground* in *Fry v. Napoleon Cmty. Sch*., 580 U.S. 154 (2017); *Powell v. Defore,* 699 F.2d 1078, 1081 (11th Cir. 1983)).

[363] *Neena S. ex rel. Robert S.,* 2008 WL 5273546, at *15.

[364] *D.E. v. Cent. Dauphin Sch. Dist*., 765 F.3d 260, 269 (3d Cir. 2014).

[365] *Id.*

[366] *Id.* (internal citation omitted).

[367] *Id.* at 270.

[368] ECF Doc. No. 30 at 23.

[369] ECF Doc. No. 25-2 at 18.

[370] We denied Parents' motion for fees under the Americans with Disabilities Act and Rehabilitation Act with prejudice in our September 9, 2022 Order. *See* ECF Doc. No. 37. We erred in the prejudice finding. We today vacate our September 9, 2022 Order only to avoid confusion and clarify we deny Parents' Motion to the extent they seek expert fees under the Americans with Disabilities Act and Rehabilitation Act *without* prejudice to timely petition for reasonable attorneys' fees and Dr. Henning's demonstrated reasonable expert fees.

[371] 20 U.S.C. § 1415(i)(3)(B)(i).

[372] *M.R. v. Ridley Sch. Dist*., 868 F.3d 218, 224 (3d Cir. 2017).

[373] *Id.* (internal citation omitted).

[374] *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 300 (2006) ("[T]he terms of the IDEA overwhelmingly support the conclusion that prevailing parents may not recover the costs of experts or consultants.").

[375] The Rehabilitation Act states: "remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 . . .shall be available to any person aggrieved . . . under [Section 504]." 29

U.S.C. § 794a(a)(2). The Civil Rights Act expressly states we "in our discretion, may allow the prevailing party. . . a reasonable attorney's fee (including expert fees) as part of the costs." 42 U.S.C. § 2000e-5(k); *see also E.H. v. Wissahickon Sch. Dist.*, No. 19-5445, 2020 WL 6286709, at *12 (E.D. Pa. Oct. 27, 2020); *A.B. by & through F.B. v. Pleasant Valley Sch. Dist.*, No. 17-02311, 2019 WL 2715681, at *9 (M.D. Pa. June 28, 2019), aff'd, 839 F. App'x 665 (3d Cir. 2020) ("Hearing Officer concluded the District denied [student] [free appropriate public education] under both the IDEA and Section 504 of the Rehabilitation Act . . . [u]nder these circumstances, courts have held expert costs may be recovered under Section 504.").

We can also award expert expert fees under the Americans with Disabilities Act. 42 U.S.C. § 12205; *see also Perkiomen Valley Sch. Dist. v. R.B.*, 533 F. Supp. 3d 233, 260 (E.D. Pa. 2021) ("[A]lthough expert fees are not recoverable under the IDEA . . . they are recoverable under § 504 of the Rehabilitation Act . . . and the ADA.").

[376] ECF Doc. No. 25-2 at 18.